UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ROBERT BOLLINGER,

      Plaintiff,

v.

BOLLINGER MOTORS, INC.,

      Defendant.

_____/

Case No. _____

Hon. _____

**VERIFIED COMPLAINT FOR DAMAGES
AND APPOINTMENT OF RECEIVER**

Plaintiff Robert Bollinger, through counsel and for his Verified Complaint for Damages and Appointment of Receiver against Defendant Bollinger Motors, Inc. ("Bollinger Motors"), states as follows:

**Parties, Jurisdiction, and Venue**

1. Robert Bollinger is a Pennsylvania resident.

2. Bollinger Motors is a Delaware corporation with its principal place of business located Oak Park, Michigan.

3. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is in excess of $75,000.

1

4. Venue is appropriately laid with this Court pursuant to 28 U.S.C. § 1391 because Bollinger Motors' principal place of business is located within this judicial district, and all of its assets are located within this judicial district.

## General Allegations

5. Robert Bollinger started Bollinger Motors in 2015.

6. Bollinger Motors started with a plan to build electric, consumer, off-road capable sport utility vehicles.

7. More recently, Bollinger Motors has shifted its focus to the development of class 4 and class 5 all-electric commercial trucks. Class 4 trucks include box trucks, step vans, and some large delivery trucks. Class 5 trucks are larger delivery trucks.

8. Bollinger Motors originally operated in New York. Robert Bollinger moved the company to the Detroit area to enhance its engineering and production capabilities, relying on the region's expertise in automotive design and production.

9. From Bollinger Motors' inception until the end of 2022, Robert Bollinger owned nearly all of the equity in Bollinger Motors.

10. In September 2022, Mullen Automotive, Inc. ("Mullen") purchased a majority interest in Bollinger Motors.

11. Despite the sale of a majority of his equity interests in 2022, Robert Bollinger remained at that time as Chief Executive Officer of Bollinger Motors and a member of its Board of Directors.

12. Although Robert Bollinger had high hopes for the future of Bollinger Motors after Mullen's investment, Mullen's equity position and effective control of the company failed to lead Bollinger Motors to self-sustaining solvency.

13. On June 22, 2024, Robert Bollinger resigned as Chief Executive Officer of Bollinger Motors due to a difference of opinion regarding the direction of the Company.

14. Robert Bollinger also fully resigned in his capacity as a member of the Board of Directors of Bollinger Motors on August 18, 2024.

15. Since his resignation as a member of the Board of Directors of Bollinger Motors, Robert Bollinger has had no management role in Bollinger Motors. However, Robert Bollinger remains a "Qualified Stockholder" under Bollinger Motors' Amended and Restated Stockholders Agreement due to the shares of stock he continues to hold in Bollinger Motors.

16. As a Qualified Stockholder, Robert Bollinger is entitled to financial information and inspection rights.

17. Despite no longer being directly employed by or involved in the management of Bollinger Motors, Robert Bollinger remained concerned about the future of Bollinger Motors.

18. On October 24, 2024, Robert Bollinger generously loaned $10,000,000 to Bollinger Motors pursuant to an Amended and Restated Secured Promissory Note. (**Ex. A**, the "Note").

19. The Note carried interest at a rate of 15% per year. (**Ex. A** at ¶ 1.)

20. Bollinger Motors was required to make interest-only payments according to the payment schedule attached to the Note. (**Ex. A** at ¶ 2(a).)

21. The Note was secured by "all of the right, title, and interest in all of the assets of the Borrower, now owned or hereafter acquired by the Borrower, or in which the Borrower now has or at any time in the future may acquire, any right, title, or interest …." (**Ex. A** at ¶ 3(a).)

22. The Security Interest excluded only a small set of inventory and intellectual property relating to consumer vehicles. (**Ex. A** at ¶ 3(b).)

23. Robert Bollinger was entitled to perfect the Security Interest under the Note by filing UCC-1 Financing Statements. (**Ex. A** at ¶ 3(c).)

24. Robert Bollinger filed a UCC-1 Financing Statement with the Delaware Secretary of State on October 24, 2024 as filing number 2024 7399528, consistent with the Note. (**Ex. B**.)

25. Upon information and belief, Robert Bollinger is the only person or entity that has a security interest in the assets of Bollinger Motors.

26. Bollinger Motors was required to make a payment of $125,000 on February 28, 2025 under the terms of the Note. (**Ex. A**.)

27. Bollinger Motors failed to make the required Note payment on February 28, 2025.

28. Under the Note, an "Event of Default" occurs when Bollinger Motors "fails to pay when due and payable …the full amount of any payment as required by the terms herein and, in the case of any payments other than any principal amounts under the Note, such failure continues for three (3) business days." (**Ex. A** at ¶ 6(a)(i).)

29. On March 5, 2025, Robert Bollinger notified Bollinger Motors of the Event of Default, and accelerated all amounts due under the Note. (**Ex. C**.)

30. When an Event of Default has occurred under the Note, "the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) shall become immediately due and payable without any action on the part of the Lender, and the Lender may exercise one or more of the following rights or remedies: (i) foreclose the Security Interest on the Collateral; (ii) pursue collection of this Note; or (iii) exercise or enforce any or all rights and remedies available upon default to a secured party under the UCC

and all other similar and applicable codes and statutes, including, but not limited to, the right to sell the Collateral, or any part thereof, at a public or private sale." (**Ex. A** at ¶ 6(b)(i).)

31. On March 12, 2025, Bollinger Motors paid $125,000 to Robert Bollinger.

32. On March 12, 2025, Robert Bollinger advised Bollinger Motors that such payment was insufficient to cure the default and the accelerated principal amount due and owing under the Note. (**Ex. D**.)

33. There is a substantial danger that the assets pledged as security for the Note will be removed from the jurisdiction of the court, lost, concealed, materially injured or damaged, diminished, or mismanaged.

34. Bollinger Motors expressly acknowledged its insolvency since at least January 8, 2025.

35. On January 3, 2025, Robert Bollinger declared an Event of Default because of a Material Adverse Change under the Note. (**Ex. E**.)

36. The Material Adverse Change under the Note was the discovery of $503,128.99 in credit card debt owed to American Express on which Bollinger Motors had defaulted.

37. Unbeknownst to Robert Bollinger, the $503,128.99 in credit card debt was incurred on credit cards that were somehow guaranteed by Robert Bollinger,

6

even though he was no longer employed by or a served as a director of Bollinger Motors.

38. The credit card debt was not disclosed to Robert Bollinger at the time Bollinger Motors executed the Note, nor was it permitted under the terms of the Note.

39. Bollinger Motors was not authorized to incur debt guaranteed by Robert Bollinger on the American Express credit cards.

40. When Bollinger Motors defaulted on the American Express credit card debt, Robert Bollinger's personal credit card transactions were rejected.

41. On January 8, 2025, Bollinger Motors claimed that it was "committed to settling its outstanding debt of $503,128.99 with American Express and intends to do so at its earliest possible opportunity." (**Ex. F**.)

42. Bollinger Motors knew these words were untrue when written, however, because internal correspondence confirmed it has been and continues to be insolvent.

43. Bollinger Motors still carries a significant American Express credit card debt that will be the responsibility of Robert Bollinger if it is not paid off.

44. Since January 8, 2025, Bollinger Motors' financial prognosis has not improved.

45. Mullen, listed on the NASDAQ, has been advised that it is not eligible for any more reverse stock splits—its primary method of raising funds in order to fund the operations of Mullen and Bollinger Motors.

46. Without significant outside investment, upon information and belief, Mullen cannot provide adequate resources to Bollinger Motors in order for it to be able to continue production.

47. Bollinger Motors cannot independently raise funds to continue production without Mullen's approval, and such approval has routinely been rejected by Mullen.

48. Bollinger Motors' accounts are routinely overdrawn, and it is unable to service the tens of millions in dollars in unsecured debt it currently carries.

49. On March 11, 2025, Bollinger Motors was sued in Oakland County Circuit Court by its supplier Auto Metal Craft, Inc. for $728,329.80 in damages. (**Ex. G.**)

50. On March 20, 2025, Bollinger Motors was sued in Oakland County Circuit Court by two other vendors: Human Capital Ventures, Inc. and Productivity Team. The amounts these entities claim to be owed are nearly $700,000.

51. Upon information and belief, numerous other suppliers are demanding payment on the amounts they are owed, and Bollinger Motors likely will be facing a deluge of collections lawsuits.

52. Upon information and belief, Bollinger Motors' suppliers are unsecured creditors.

53. Upon information and belief, Bollinger Motors does not have any defenses to the potential claims of its vendors.

54. Bollinger Motor's principal production facility is shut down because the production facility is owed roughly $1.2 million, and the production team has been furloughed.

55. Upon information and belief, Bollinger Motors has more than tens of millions of dollars in accounts payable with $0 in accounts receivable.

56. Bollinger Motors has more than 40 trucks available for sale.

57. Each of these electric trucks has a retail value of $135,000, for a total value in excess of $5 million.

58. Each of these trucks are subject to Robert Bollinger's Security Interest.

59. These trucks are street-legal and could be driven away from Bollinger Motors' storage facility by any employee with access to the keys.

60. Further, any disgruntled employee, stockholder, or vendor could abscond with one or more of the electric trucks in order to offset any debt claimed to be owed.

61. In addition to the electric trucks, Bollinger Motors invested $15 million in the acquisition of its production machinery.

62. The production machinery sits in a production facility owned and controlled by Bollinger Motors' production partner, Roush Corporation.

63. Bollinger Motors paid-in-full for the production machinery, and other than Robert Bollinger's lien against the production machinery, the production machinery has not been pledged as security for any other debt.

64. Bollinger Motors invested significantly in the development of the intellectual property for the class 4 and class 5 trucks it has produced and could produce.

65. Bollinger Motors' intellectual property includes significant proprietary trade secrets associated with the development, design, and manufacture of its class 4 and class 5 trucks, which is part of Robert Bollinger's collateral to secure the Note.

66. Bollinger Motors' has taken steps to protect its trade secrets and intellectual property to ensure that it is not generally known outside the company.

67. Within Bollinger Motors, its trade secrets and intellectual property are kept in password protected files that should not be generally accessible by employees that do not have a need to know the trade secrets and/or intellectual property.

68. Any third party that wants access to review the Bollinger Motors intellectual property and trade secrets, such as a vendor or a prospective investor, must sign a non-disclosure agreement to limit their access to the information and ability to disclose the information.

69. Nevertheless, for those parties who might have access to the trade secrets and/or intellectual property, this information could be copied and transferred via the internet or a portable hard drive.

70. There is a risk that a disgruntled employee, director, officer, stockholder, or vendor could transfer the valuable Bollinger Motors intellectual property and trade secrets to themselves in an attempt to profit from the hard work of the Company.

71. If the intellectual property and trade secrets became generally known or released beyond Bollinger Motors, the value of the intellectual property and trade secrets would be significantly damaged.

72. The appointment of a receiver over Bollinger Motors' assets is necessary to protect such assets from dissipation, damage, destruction, concealment, disposal, or loss.

73. Robert Bollinger has a valid security interest in the assets of Bollinger Motors.

74. Robert Bollinger is owed in excess of $10,500,000, secured by substantially all of Bollinger Motors' assets.

75. Alternative legal remedies, such as an award of damages, do not exist since Bollinger Motors has no available resources to allow it to pay its debts.

...

76. The appointment of a receiver will do more good than harm because it will allow for the orderly disposition of Bollinger Motors' assets.

## Count I – Breach of Contract

77. Robert Bollinger restates the foregoing allegations as though fully stated herein.

78. The Note is a valid and enforceable contract.

79. Bollinger Motors defaulted on its obligations under the Note when it failed to make payment when due on February 28, 2025, and then failed to provide payment within the three business days following February 28, 2025 (the "Default").

80. Because of the Default, the full amount of the Note is due and owing to Robert Bollinger.

81. Robert Bollinger has suffered damages as a result of Bollinger Motors' breach.

82. Robert Bollinger seeks judgment as set forth below.

## Count II – Appointment of Receiver

83. Robert Bollinger restates the foregoing allegations as though fully set forth herein.

84. Good cause exists for the appointment of a receiver.

85. Bollinger Motors is without the resources to preserve the collateral pledged as security under the Note.

86. Bollinger Motors' collateral is jeopardized and in danger of further deterioration.

87. Robert Bollinger is entitled to have the receiver appointed as a matter of equity to protect it from injury and to ensure that its collateral is sold or otherwise liquidated, and all proceeds are remitted to Robert Bollinger until all obligations owed to him are paid in full.

88. Appointment of a receiver will ensure that the assets of Bollinger Motors, which may exceed the value of the Note, are collected and organized in a fashion that will preserve value for Bollinger Motors' unsecured creditors.

89. Without the appointment of a receiver, Robert Bollinger is at risk of immediate and irreparable injury, loss, and damage to its collateral unless a receiver is appointed.

90. The financial condition of Bollinger Motors and its inability to preserve the collateral jeopardizes Robert Bollinger's secured priority position.

91. The appointment of a receiver is necessary to preserve, protect, and maintain the value of Robert Bollinger's interests in the collateral and to maximize the value of Bollinger Motors' business operations.

92. Robert Bollinger requests that the Court enter an order (a) appointing a receiver over Bollinger Motors during the pendency of this action; and (b) requiring all persons who have possession or control of collateral or other real or personal

property arising out of, or pertaining to Bollinger Motors' business operations, to yield and deliver possession of the same to the receiver appointed by the Court.

## Relief Requested

WHEREFORE, Plaintiff Robert Bollinger respectfully requests that this Court enter Judgment against Defendant Bollinger Motors, Inc. as follows:

A. Awarding Robert Bollinger damages for Bollinger Motors' breach of contract in an amount not less than $10,500,000, plus interest, attorneys' fees and costs, and all other damages arising from Bollinger Motors' breach of the Note;

B. Immediate appointment of Eugene Kohut as receiver over Bollinger Motors to take charge of, manage, preserve, protect, oversee, and liquidate the assets and business operations of Bollinger Motors, and to apply the net proceeds of sale derived therefrom to the amounts owed Robert Bollinger and to other creditors in the proper order of priority of their respective claims based upon applicable law;

C. Enjoining Bollinger Motors, and its employees, officers, directors, and stockholders from damaging, destroying, concealing, disposing of, or dissipating the value of Bollinger Motors' assets;

D.  Awarding Robert Bollinger such other relief as this Court deems just and equitable under the circumstances.

                                              Respectfully submitted,

                                              WINTHROP & WEINSTINE, P.A.

Dated: March 21, 2025                 By: /s/H. William Burdett, Jr.
                                                 H. William Burdett, Jr. (P63185)
                                            P.O. Box 15038
                                            Lansing, Michigan 48901
                                            (313) 318-9203
                                            bburdett@winthrop.com
                                            *Attorneys for Robert Bollinger*

## **VERIFICATION**

I, Robert Bollinger, have reviewed the factual allegations set forth in the Verified Complaint for Damages and Appointment of Receiver against Bollinger Motors, Inc. I believe the factual allegations therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that my statements in this Verification are true and correct.

_____
Robert Bollinger

30959699v2