UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ROBERT BOLLINGER,**<br><br>Plaintiff,<br><br>v.<br><br>**BOLLINGER MOTORS, INC.,**<br><br>Defendant. | 2:25-CV-10790-TGB-APP<br><br>HON. TERRENCE G. BERG<br><br>**OPINION AND ORDER GRANTING PLAINTIFF'S RENEWED MOTION TO APPOINT RECEIVER**<br><br>**(ECF NO. 17)** |

Robert Bollinger ("Plaintiff") has sued Bollinger Motors, Inc. ("Defendant") for breach of contract. Plaintiff moved this Court to appoint a receiver to manage Defendant's affairs to prevent the loss of assets to which Plaintiff claims he is entitled. After reviewing the record and the law, and holding a hearing in which the Court heard testimony from critical officers of Defendant, and argument from both parties, the Court will **GRANT** Plaintiff's Renewed Motion to Appoint a Receiver.

## I. BACKGROUND

On March 21, 2025, Plaintiff filed a lawsuit against Defendant in this Court, alleging that Defendant owed Plaintiff more than $10,000,000 for breaching the terms of a note for that amount. ECF No. 1, PageID.4-5, PageID.11. On March 24, 2025, Plaintiff then filed an Emergency Motion to Appoint a Receiver over Defendant. ECF No. 3. Plaintiff alleged

that Defendant was insolvent, that Plaintiff was a secured creditor of Defendant with a right to recover collateral from Defendant, and that there was a risk that Defendant would dissipate that collateral if the Court did not appoint a receiver. ECF No. 3, PageID.66-67, PageID.70-72, 75-77.

The Court held a hearing on the Emergency Motion on March 31, 2025. At that hearing, the Court stated that Plaintiff had not yet met its burden for the Court to impose a receiver to govern Defendant. The Court scheduled an evidentiary hearing for May 7, 2025, and allowed the Parties to brief the issue and present evidence and argument over whether a receiver would be necessary and proper. ECF No. 16 (Notice to Appear in Person for Evidentiary Hearing).

On April 22, 2025, Plaintiff filed a Renewed Motion to Appoint a Receiver. ECF No. 17. In that Motion, Plaintiff argued that confidential information Plaintiff had received from Defendant in Plaintiff's role as a Qualified Stockholder of Defendant indicated that Defendant is deeply insolvent, such that a receiver should be appointed. ECF No. 17, PageID.276; ECF No. 18, PageID.301. On April 24, 2025, Defendant filed a Response to this Motion, ECF No. 20, and an Answer to Plaintiff's Complaint. ECF No. 21.

The Court held a hearing on Plaintiff's Renewed Motion on May 7, 2025. At the hearing, the Court heard testimony from Defendant's President and Chief Executive Officer, Bryan Chambers, Defendant's

Vice President and Corporate Controller, Shane Monson, and the proposed Receiver, Eugene Kohut. The parties also presented evidence relating to the state of Defendant's business.

The testimony and evidence—which Defendant's counsel conceded accurately reflected Defendant's finances—showed that Defendant is in crisis. For months Defendant has owed more than twenty million dollars to suppliers, contractors, service providers, and owners of physical space. These debts are owed to parties who are critical for Defendant's functioning. CEO Bryan Chambers testified that Defendant was locked out of its production facilities on May 5, 2025, and that the owner of the production facilities was seeking to permanently evict Defendant. The Court heard that Defendant had been prevented from accessing its critical manufacturing accounting system for a short time at the end of April 2025, before making a partial payment to restart services.

In one document Chambers prepared, Defendant reported that it had "close to nothing" to try to "keep the lights on" at the company. And while Defendant has more than twenty million dollars in debts, it has no means of paying those debts back, much less the ten million dollars that Plaintiff claims that he is owed. Defendant, an electric vehicle seller, controls around forty electric vehicles, but even if Defendant sold all of them, the sales revenue would not be sufficient to cover Defendant's debts. Moreover, the Court heard that there are not prospects for such

3

sales: Defendant has sold around four trucks this year, to the best of the Chambers' recollection.

While Defendant has struggled to "keep the lights on," Chambers testified concerning the difficulties in obtaining sufficient funding from its majority shareholder, Mullen Automotive. The Court heard undisputed testimony from Defendant's officers that Mullen has made many promises to provide Defendant with adequate funding, but has provided barely enough to meet the Company's minimum requirements to remain in operation. For example, the Court heard how Defendant's Vice President informed Mullen that Defendant needed a certain amount of money to pay current obligations, and that it needed a smaller amount for highly critical obligations. Mullen only provided the smaller amount. In response to a question by the Court, Defendant's CEO admitted that Defendant had no plan at all to pay off its millions of dollars in obligations.

And while Defendant laid off employees, delayed 401k payments, and got locked out of its facilities, Defendant's board has not met even once since July 2024, despite repeated requests from the CEO for such a meeting to be held. The Court heard that three of the five Board Members are appointed by Mullen, that a meeting may be called only by a majority of the board, and that Mullen's CEO, the chairman of Defendant's Board, would *ignore verbal requests* to hold a board meeting. Defendant's CEO

4

would put those requests in writing as well, to make it less likely that Mullen's CEO would ignore them, but to no avail.

One reason why Mullen might not be providing Defendant with sufficient funding is that, as presented to the Court, Mullen has recently been prohibited from transferring funds to other entities as the result of judgment issued by the United States District Court for the Southern District of New York. *See GEM Yield Bahamas Limited, et al. v. Mullen Automotive, Inc., et al.*, No. 1-24-cv-00120-KPF, ECF No. 148, at 1-2 (S.D.N.Y. Feb. 13, 2025) (Failla, J.) (issuing a $23,583,570.26 judgment against Mullen, along with additional interest); *id.* at ECF No. 183, at 1-4 (S.D.N.Y. Apr. 25, 2025) (GEM Yield Bahamas Limited's letter to Mullen, stating that New York law prohibits Mullen from transferring any property in which Mullen has an interest while Mullen remains a judgment debtor); *id.* at ECF No. 192 at 3 (S.D.N.Y. Apr. 30, 2025) (Judge Failla's order denying Mullen's request to strike this restraining notice, and stating that such restraining notices are supported by "ample authority" in New York law). This court order makes it less likely that Mullen will be in a position to support Defendant with any additional funds.

Meanwhile, Defendants obligations continue to pile up. Defendant faces several other lawsuits for unpaid debt, and pursuant to a previous Order by the Court, has notified its claimants of Plaintiff's secured interest in Defendant's assets.

5

The Court also heard testimony from Plaintiff's proposed receiver, Eugene Kohut. Kohut testified that he has significant experience administering bankruptcies and receiverships for automotive companies like Defendant. Kohut also testified that with the assistance of Plaintiff, he hoped that Defendant could be sold as a going concern to preserve value for Defendant's secured creditor, Plaintiff, as well as Defendants' many unsecured creditors.

At the close of the hearing, the Court concluded that Plaintiff had presented sufficient evidence to support the Court's entering of an order appointing a receiver to manage Defendant's affairs. The Court also ordered the parties to submit a proposed order detailing the responsibilities and authority the receiver would have. In the following Opinion and Order, the Court sets out its reasoning for appointing a receiver and the legal authority in support of the separate order defining the powers and duties of the receiver in managing Defendant.

## II. STANDARD

> An equity receiver is a person specially appointed by the court to take control, custody, or management of property that is involved in or is likely to become involved in litigation for the purpose of preserving the property, receiving rents, issues, or profits, and undertaking any other appropriate action with regard to the property pending its final disposition by the suit.

12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2981 (3d ed. 2025).

"Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver if a person with an interest in the property provides sufficient justification." *PNC Bank, Nat. Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014). Such interests can include the interests of secured creditors like Plaintiff. *See Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012).

In determining whether to exercise their discretion to appoint a receiver, courts consider a number of factors, including the existence of a valid claim by the moving party and its probability of success, the probability that fraudulent conduct will frustrate the claim, imminent danger that property will be lost or diminished in value, whether legal remedies or less drastic equitable remedies are inadequate, and the likelihood that the appointment of a receiver will do more harm than good. *Meyer Jewelry Co. v. Meyer Holdings, Inc.*, 906 F. Supp. 428, 432 (E.D. Mich. 1995); *see also PNC Bank, Nat. Ass'n*, 15 F. Supp. 3d at 758.

### III. ANALYSIS

Applying the factors set out in *Meyer Jewelry Co.* and *PNC Bank, Nat. Ass'n* makes it clear that a receiver should be appointed to manage Defendant's affairs to preserve the property at issue in this lawsuit.

### 1.     Plaintiff Has a Valid Claim Which is Likely to Succeed

A court would not want to grant the extraordinary remedy of a receivership unless the moving party had a valid claim over the property at issue, with a high likelihood of success. *See Meyer Jewelry Co.*, 906 F. Supp. at 432-33 (finding that a low likelihood of success supported finding that a receiver was inappropriate).

Here, Plaintiff's claim appears valid and highly likely to succeed. Defendant does not dispute the terms of the Note it entered into with Plaintiff. Under the Note, Plaintiff loaned Defendant $10,000,000. ECF No. 1-2, PageID.18. As consideration for the $10,000,000, Defendant granted Plaintiff a security interest "in all of the assets of [Defendant]," with some exceptions that are not relevant to the validity of the claim. ECF No. 1-2, PageID.18. The Note stated that Defendant would be in default of the Note if Defendant failed to make a required payment, and such failure continued for three business days. ECF No. 1-2, PageID.22. And the Note provided that if Defendant defaulted, the total principal amount of the Note would become immediately due and payable to Plaintiff, and that Plaintiff could foreclose on the collateral and pursue collection of the Note. ECF No. 1-2, PageID.23.

Here, Plaintiff asserted that Defendant was required to make a $125,000 payment under the Note on February 28, 2025. ECF No. 1, PageID.5. Defendant failed to do so, and this failure continued for three business days. *Id*. This constitutes a default under the terms of the Note.

8

Therefore, the remaining principal amount of the Note automatically became immediately due and payable to Plaintiff. ECF No. 1-2, PageID.23. Plaintiff therefore has a valid claim for more than $10,000,000 against Defendant. Defendant has had several opportunities to challenge the validity of this claim (or its likelihood of success), both in pleadings and in person before the Court. Defendant does contend in its Answer that Plaintiff's claims are barred because it later accepted late or partial payments. ECF No. 21, PageID.355. But Defendant has not pointed to persuasive caselaw, nor language in the Note, which would support a finding by the Court or a jury that Plaintiff does not have a valid claim for $10,000,000, or that Defendant waived its claim. Moreover, the Note provides that its provisions may only be waived or amended with prior written consent of Plaintiff and Defendant. ECF No. 1-2, PageID.23. Defendant never waived its right to receive the full $10,000,000. Therefore, Plaintiff has a valid claim for $10,000,000 against Defendant, and that claim is highly likely to succeed. This supports appointing a receiver, because it makes it unlikely that Defendant will suffer unjust harm by the appointment, or that Plaintiff will be unjustly enriched.

    **2.    Fraudulent Conduct**

As to whether Plaintiff has presented evidence demonstrating a clear risk of fraudulent conduct that will frustrate Plaintiff's claim, this element is less compelling on the record before the Court. However, the

undisputed actions of Mullen Automotive, Defendant's controlling shareholder, give rise to some concerns. From the evidence presented to the Court, Mullen has failed to call a board meeting for Defendant (an action within Mullen's power) since July 2024, even as Defendant's CEO pleaded for guidance from the board. Directors owe fiduciary duties to the corporation, and here those duties were not being fulfilled. While refusing to hold a board meeting or provide such guidance, Mullen also kept Defendant in a holding pattern, providing just enough money to stave off total failure, but not enough money to pay the company's ever-growing list of creditors. More than once, Mullen would promise to provide adequate funding to Defendant, but the sums received were consistently insufficient. Moreover, Plaintiff presented evidence that Mullen's ability to provide funding may be disappearing: Mullen is apparently now subject to a federal court judgment and restraining order from the Southern District of New York prohibiting Mullen from transferring funds elsewhere. *See GEM Yield Bahamas Limited, et al. v. Mullen Automotive, Inc., et al.*, No. 1-24-cv-00120-KPF, ECF No. 148, at 1-2 (S.D.N.Y. Feb. 13, 2025) (Failla, J.); ECF No. 183, at 1-4 (S.D.N.Y. Apr. 25, 2025); *id.* at ECF No. 192 at 3 (S.D.N.Y. Apr. 30, 2025). Mullen is clearly having financial troubles of its own.

  Defendant's CEO's testimony also suggests that Mullen may have violated the restraining order affirmed by Judge Failla. On April 30, 2025, Judge Failla affirmed the restraining order stating that Mullen

could not transfer funds, yet Chambers testified that Mullen wired Defendant several hundred thousand dollars on the night of May 6, 2025.

While the conduct of Mullen here does not rise to the level of fraud, it hardly engenders trust either. Mullen and Defendant have no plan to pay off their more than twenty million dollars in obligations to creditors, an amount which does not include Plaintiff's $10,000,000 claim. Judge Cardozo famously defined a fiduciary duty as "something stricter than the morals of the market place . . . [n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928). Mullen clearly breached this standard in its management of Defendant by not calling a board meeting for months as the company was collapsing and laying off workers. With Defendant's one "benefactor" behaving in this way, Defendant will not be able to pay its debts without a receiver governing its affairs. A receiver would protect Plaintiff's claim. Defendant cannot, and Mullen will not. Although the Court finds no proof that fraudulent conduct has taken place, the poor management by Mullen has created a rich soil in which fraud could potentially thrive by allowing Defendant to rack up millions of dollars in debt, failing to pay what it owes (including to Defendant's employees), and doing nothing as lawsuits pile up. This situation, as presented to the Court with undisputed evidence, calls for the Court's intervention.

### 3. Plaintiff's Property Will be Lost Without a Receiver

Defendant owes Plaintiff $10,000,000. But the hearing the Court held on Plaintiff's Renewed Motion for a Receiver demonstrated that Defendant can hardly meet its weekly payroll obligations, and that Defendant is unable to pay its suppliers, contractors, or creditors. Defendant certainly cannot afford to pay Plaintiff the $10,000,000 it owes him. Defendant owes other parties around $20,000,000. Defendant has been locked out of their production facilities: they can't build new vehicles. Defendant's only source of funding, apart from speculative hopes of future truck sales (which would not even cover their debts) is a majority shareholder which has demonstrated that it cannot or will not provide adequate operating capital for Defendant.

If a receiver is not appointed, Defendant will continue to accrue debt that it will not be able to pay. In order to operate, Defendant will have to expend assets to meet its obligations. But Plaintiff has a security interest in almost all of Defendant's assets, so Defendant's expending assets to survive will cause Plaintiff loss. *See* ECF No. 1-2, PageID.18-19. Even if Defendant's for-sale trucks are not collateral, it appears that under the terms of the Note the proceeds from their sale would be. *See id.* at Section 3(b)(b) (providing that even when "Inventory" is excluded from the definition of collateral, the proceeds from its sale are still defined as collateral unless the proceeds would themselves be "Inventory").

Because Defendant has $20,000,000 in obligations apart from Plaintiff's $10,000,000, and Plaintiff's secured interest has priority over the other amounts Defendant owes, a receiver is appropriate to protect Plaintiff's interests. Otherwise, Defendant would attempt to pay critical suppliers their debts in order to keep production going, and there would eventually be no money left to pay Plaintiff. Indeed, such was the course of conduct Mullen encouraged for Defendant: Mullen gives Defendant enough money to keep certain critical functions going while failing to pay other less critical debts. If Defendant stays on this path, Plaintiff's collateral will be lost. Defendant's desperate situation of insolvency, along with Plaintiff's likelihood of success in this lawsuit, are determinative in the Court's decision to appoint a receiver.

### 3. Legal and Other Remedies are Inadequate

Because Defendant's financial situation is so dire, merely allowing Plaintiff to pursue this case to judgment would be inadequate to protect his interests. Defendant is already finding it extremely difficult to "keep the lights on." By the time Plaintiff can secure a judgment, there may be no assets left and nothing against which to take a judgment. Defendant offers no reasons to find otherwise and points to no alternate remedies that would make Plaintiff whole.

### 4. Appointing a Receiver Will Likely do More Good Than Harm

It is unfortunate that Defendant's financial situation has deteriorated to the point where the Court must appoint a receiver. The receiver will have broad powers to oversee Defendant, which include the option to liquidate Defendant. But this remedy will do more good than harm. Defendant is already laying off workers and delaying its payroll obligations. Defendant is already no longer manufacturing any vehicles, and is locked out of its production and testing facilities. Since Defendant can no longer operate as a viable company, more would be gained by giving a receiver a chance to marshal the assets, and explore potential options in an attempt to salvage the company. If nothing can save the company, there is little loss in its potential liquidation. And if the receiver is able to pay Defendant's creditors, that will have a good effect. Under the status quo Defendant is effectively unable to operate, and *also* is failing to pay its creditors. Appointing the receiver will alter that status quo for the better.

### IV. CONCLUSION

For the reasons stated in this Order, the Court finds that appointing a receiver to manage the affairs of Defendant is the appropriate action to take in order to protect Plaintiff's valid claim. Plaintiff has provided sufficient justification for the Court to impose this extraordinary remedy. Defendant's failure to pay its debts, including its

$10,000,000 debt to Plaintiff, justifies the Court's intervention to prevent any further dissipation of assets or loss of collateral.

By separate order, therefore, the Court has appointed Eugene Kohut, Esq., as receiver of the assets of Defendant.

**SO ORDERED.**

Dated: May 8, 2025                     /s/Terrence G. Berg
                                       _____
                                       HON. TERRENCE G. BERG
                                       UNITED STATES DISTRICT JUDGE