# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ROBERT BOLLINGER,**

 *Plaintiff*,

 v.

**BOLLINGER MOTORS, INC.,**

 *Defendant*.

Case No. 2:25-cv-10790-TGB-APP

Hon. Terrence G. Berg

Hon. Mag. Anthony P. Patti

## PROPOSED INTERVENOR MULLEN AUTOMOTIVE, INC.'S EMERGENCY MOTION TO INTERVENE

For the reasons set forth in its incorporated Brief in Support, Proposed Intervenor Mullen Automotive, Inc. ("Mullen") moves on an emergency basis for an order permitting it to (1) intervene as of right under Federal Rule of Civil Procedure 24(a)(2) to oppose Plaintiff's Count II for Appointment of Receiver and (2) file the attached proposed emergency motion for reconsideration of the Opinion and Order Granting Plaintiff's Renewed Motion to Appoint Receiver or, in the alternative, for modification of the Order Appointing Receiver (Ex. 1).

Mullen has not attached a "pleading" under Federal Rule of Civil Procedure 24(c) because "the parties are clearly on notice" of its arguments in opposition to the appointment of a receiver from this motion and its attached proposed motion for

reconsideration. *Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 314-15 (6th Cir. 2005).

On May 16, 2025, counsel for Mullen contacted the parties via email to inform them of the relief requested and determine whether the parties would concur. Plaintiff's counsel advised via email that Plaintiff does not concur in the relief requested. During and after a subsequent meet-and-confer call on May 16, 2025, however, the parties have worked toward a resolution of this matter. Given the emergency nature of the relief requested (which would avoid a potential involuntary sale of Defendant Bollinger Motors, Inc. ("Bollinger") before Mullen can obtain relief), Mullen submits this motion while those discussions are ongoing, and respectfully requests that this Court:

(1)    grant this motion and permit it to intervene in this matter in order to oppose Plaintiff's Count II for Appointment of Receiver;

(2)    allow it to file the attached proposed Emergency Motion for Reconsideration (Ex. 1); and

(3)    order the parties to file a response, if any, to this motion within 7 days.

A proposed order for this Court's consideration is attached as Exhibit 2.

DYKEMA GOSSETT PLLC

Dated: May 20, 2025                    By: *s/ Jennifer L. Beidel*
                                       Jennifer L. Beidel (P86645)
                                       Brian M. Moore (P58584)
                                       Mark Chutkow (P86076)
                                       39577 Woodward Ave, Suite 300
                                       Bloomfield Hills, MI 48304
                                       Telephone: (248) 203-0506; (248) 203-
                                       0772; (248) 203-0715
                                       JBeidel@dykema.com
                                       BMoore@dykema.com
                                       MChutkow@dykema.com

                                       Kyle M. Asher (P80359)
                                       201 Townsend Street, Suite 900
                                       Lansing, MI 48933
                                       Telephone: (517) 374-9151
                                       KAsher@dykema.com

                                       Andrew T. VanEgmond (P82134)
                                       2723 South State St, Suite 400
                                       Ann Arbor, MI 48104
                                       Telephone: (734) 214-7603
                                       AVanegmond@dykema.com

                                       *Attorneys for Proposed Intervenor Mullen
                                       Automotive, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ROBERT BOLLINGER,**

    *Plaintiff,*

    v.

**BOLLINGER MOTORS, INC.,**

    *Defendant.*

Case No. 2:25-cv-10790-TGB-APP

Hon. Terrence G. Berg

Hon. Mag. Anthony P. Patti

## PROPOSED INTERVENOR MULLEN AUTOMOTIVE, INC.'S BRIEF IN SUPPORT OF ITS EMERGENCY MOTION TO INTERVENE

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CONCISE STATEMENT OF ISSUES PRESENTED ..............................................1

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..............................2

I.      INTRODUCTION ..................................................................................3

II.     BACKGROUND ....................................................................................4

        A.      Plaintiff Sells His Majority Stake in Bollinger to Mullen but
                Then Has a Falling Out with Mullen......................................................4

        B.      Mullen Continues to Fund and Support Bollinger. ..............................5

        C.      This Court Appoints a Receiver Based on Incomplete Evidence. ........7

        D.      An Imminent Potential Sale Threatens Mullen's Majority Stake
                in Bollinger..........................................................................................10

III.    LEGAL STANDARDS ........................................................................11

IV.     ARGUMENT........................................................................................12

        A.      Intervention Is Mandatory Because Mullen Has an Interest in
                Preserving Its Majority Stake in Bollinger and the Existing
                Parties Do Not Adequately Represent That Interest. .........................12

                1.      This Motion Is Timely Because Mullen Only Recently
                        Learned that the Existing Parties Do Not Adequately
                        Represent Its Interests. ..............................................................12

                2.      Mullen's Substantial Legal Interest in Preserving Its
                        Majority Stake in Bollinger May Be Impaired Absent
                        Intervention Because the Existing Parties Will Not Protect
                        It. ................................................................................................18

        B.      A Shortened Briefing Schedule Is Warranted Because of the
                Imminent Risk that Mullen May Lose its Majority Stake in
                Bollinger. ...........................................................................................19

V.      CONCLUSION....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coalition to Defend Affirmative Action v. Granholm,*
  501 F.3d 775 (6th Cir. 2007) ................................................................19

*Grainger v. Ottawa Cnty.,*
  90 F.4th 507 (6th Cir. 2024) ....................................................2, 11, 18

*Grutter v. Bollinger,*
  188 F.3d 394 (6th Cir. 1999) ..............................................................18

*Mich. State AFL-CIO v. Miller,*
  103 F.3d 1240 (6th Cir. 1997) ...........................................2, 12, 18, 19

*United States v. Michigan,*
  68 F.4th 1021 (6th Cir. 2023) .......................................................2, 13

**Other Authorities**

Federal Rule of Civil Procedure 24(a) ...............................................11, 12

Federal Rule of Civil Procedure 24(a)(2) .........................................*passim*

LR 7.1(e)(1)(A) .....................................................................................19

Rule 26(f) ..............................................................................................13

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.      Does Mullen qualify for mandatory intervention under Federal Rule of Civil Procedure 24(a)(2) when it has a substantial interest in maintaining its majority stake in Bollinger, that interest is under imminent threat due to a potential forthcoming involuntary sale of Bollinger by the receiver, Mullen cannot rely on the existing parties to adequately represent its interest in Bollinger, and Mullen promptly filed this motion seeking to protect its interests after it learned that it cannot rely on the existing parties to adequately represent its interests?

**Mullen Answers**: Yes.

2.      Should this Court order the parties to respond to this motion within 7 days due to the imminent potential sale of Bollinger and corresponding potential loss of Mullen's ownership interest in Bollinger?

**Mullen Answers**: Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

(1)   Fed. R. Civ. P. 24(a)(2)

(2)   *Grainger v. Ottawa Cnty.*, 90 F.4th 507 (6th Cir. 2024)

(3)   *United States v. Michigan*, 68 F.4th 1021 (6th Cir. 2023)

(4)   *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997)

## I.  <u>INTRODUCTION</u>

Proposed Intervenor Mullen Automotive, Inc. ("Mullen") moves to intervene as of right under Federal Rule of Civil Procedure 24(a)(2) because no party adequately represented or protected Mullen's majority interest in Bollinger Motors, Inc. ("Bollinger") at the May 7 hearing. Mullen has invested nearly $180 million acquiring a majority interest in Bollinger and funding certain of its necessary operations and obligations. But the parties failed to mention many key facts about Mullen's ongoing support of Bollinger at the hearing, including that Plaintiff and his allies at Bollinger have long opposed and stymied Mullen's path forward for Bollinger. Nor did the parties accurately portray Mullen's ability and willingness to continue to fund Bollinger moving forward—including paying off Plaintiff's $10 million loan—which would resolve the underlying breach of contract claim giving rise to the request for appointment of a receiver.

Mullen has concerns that Plaintiff's objective in this lawsuit is not simply the repayment of his loan, but rather to wrest control of his namesake company from Mullen through the receivership. Plaintiff has worked with various Bollinger employees loyal to him in what appears to be a plan to call his loan, force Bollinger into receivership and sell it to one of Mullen's competitors, preventing Mullen from executing its proposed reorganization plan. Unaware of Plaintiff's plan, Mullen did not realize it needed to intervene to protect its own interests from Plaintiff's

3

takeover-via-receivership until after the hearing and the beginning of the receivership laid that plan bare.

The standards for mandatory intervention under Rule 24(a)(2) are satisfied here because Mullen has a substantial interest in maintaining its majority stake in Bollinger, that stake is under imminent threat due to a potential forthcoming involuntary sale of Bollinger by the receiver, and Mullen cannot rely on the existing parties to adequately represent Mullen's interest in Bollinger. Mullen promptly filed this motion seeking to protect its interests after it learned, based on the testimony at the hearing and the events following the appointment of the receiver, that the existing parties are not adequately protecting its interests.

For these reasons and as further shown below, Mullen asks this Court to grant this motion to intervene and permit it to file the attached proposed motion for reconsideration and a stay or, alternatively, modification of the receiver order. As further detailed in the attached proposed motion, at the very least, the receiver order should be modified in part to prevent the receiver from selling all or substantially all of the assets of Bollinger at this time.

## II.   BACKGROUND

### A.   Plaintiff Sells His Majority Stake in Bollinger to Mullen but Then Has a Falling Out with Mullen.

Plaintiff founded Bollinger—his namesake company—in 2015 and ran it for seven years. Compl. ¶¶ 5, 9, PageID.2. In September 2022, he sold his majority stake

in Bollinger to Mullen for $148.2 million. *Id.* ¶ 10, PageID.2. After the sale, Plaintiff remained Bollinger's Chief Executive Officer and a board member. *Id.* ¶ 11, PageID.3.

But the relationship between Plaintiff and David Michery, Mullen's CEO and the chairman of Bollinger's Board of Directors, deteriorated, largely because Plaintiff disagreed with Michery's consolidation and cost-cutting measures for Bollinger. Michery Decl. ¶¶ 33-39; *see also* Compl. ¶¶ 12-13, PageID.3. Plaintiff ultimately left his positions as both CEO and director. *Id.* ¶¶ 13-14, PageID.3.

### B.     Mullen Continues to Fund and Support Bollinger.

Throughout its time as Bollinger's majority shareholder, Mullen has invested more than $178 million into Bollinger. Michery Decl., Ex. 3, at ¶ 13. That funding has been used for Bollinger's payroll, benefits, operating expenses, and payments on Plaintiff's note. *Id.* Much of that funding has come from an investor who has committed to fund both Mullen and Bollinger at a rate of $1.5 million per week and has invested over $800 million in Mullen over the past 9 years—but that investor is only willing to fund Bollinger through Mullen (as opposed to funding Bollinger directly). *Id.* ¶¶ 7, 10. Mullen has never indicated to Plaintiff or anyone at Bollinger that it could not or would not continue to fund Bollinger. *Id.* ¶ 13.

In October 2024, long after he was no longer Bollinger's CEO or a board member, Plaintiff loaned Bollinger $10 million, and Bollinger agreed to make

interest-only payments to Plaintiff under that loan's Note. Compl. ¶¶ 18-20, PageID.4; Note ECF 1-2, PageID.31. Although Bollinger has made every other payment owed under the Note, it missed one payment—and then cured that default by making the payment to Bollinger days later. Compl. ¶ 27; 5/7/2025 Hr'g Tr. at 18:5-11, ECF No. 34, PageID.479 (acknowledging payment). Within days of the default, Plaintiff "accelerated all amounts due under the Note." Compl. ¶ 29, PageID.5. Then, just over 2 weeks later, Plaintiff filed this action seeking not just repayment of the loan, but also the emergency appointment of a receiver with the authority to sell all or substantially all of the assets of Bollinger out from under Mullen. *Id.* ¶¶ 83-92, PageID.12-14; Emergency Mot. to Appoint Receiver, ECF No. 3.

As Mullen discovered after the evidentiary hearing, many key Bollinger employees knew Plaintiff intended to sue Bollinger for defaulting on the Note and were aligned with his strategy of using the default to push Bollinger into receivership and wrest Bollinger away from Mullen. Michery Decl. ¶ 20. For example, the day before Plaintiff filed his Complaint, Jim Connelly, Bollinger's sales lead, told his team that "something big was happening." *Id.* And he later directed his staff to stop selling until Bollinger was placed into receivership. *Id.* Other Bollinger employees rejoiced at their "win" after the receiver was appointed or their thrill to be away from Mullen. *Id.* ¶¶ 20-21. And some even directed a potential purchaser, Motiv, not to

call Bollinger until after the receivership hearing. *Id.* ¶ 22.

### C.  This Court Appoints a Receiver Based on Incomplete Evidence.

At the first hearing on Plaintiff's motion to appoint a receiver, this Court was rightly suspect of Plaintiff's request. *See* 3/31/25 Hr'g Tr. at 5:16-20, ECF No. 13, PageID.168 ("[Y]ou need to show fraud and you didn't do it in your briefing."). Nor was this Court "convinced . . . that there's evidence of imminent danger of the destruction or dissipation of property." *Id.* at 30:9-12, PageID.193. Although this Court found a "serious question about the insolvency of" Bollinger, it reasoned that an alleged inability to pay a debt, standing alone, "doesn't mean that the whole company goes into receivership." *Id.* at 30:13-19, PageID.193.

This Court concluded that "it would be appropriate to preserve the status quo until we can have a hearing where both sides can present their evidence" regarding the receivership request. *Id.* at 34:2-5, PageID.197. As this Court put it, "we need to proceed according to basic fairness, which means both sides have to be able to present their evidence before the Court makes such a significant decision under equity as to appoint a receiver." *Id.* at 42:6-9, PageID.205. This Court therefore denied the motion without prejudice and set an evidentiary hearing for May 7. Minute Entry, ECF No. 12.

At the evidentiary hearing, only Plaintiff called witnesses—not Bollinger. *See* 5/7/25 Hr'g Tr. at 3, ECF No. 34, PageID.464. And the witnesses and documentary

evidence painted a one-sided picture of Mullen—a picture contradicted by other evidence not before this Court at the hearing. Those inaccuracies fall into the following categories:

- Statements suggesting that Mullen was irresponsible in not calling a board meeting or otherwise giving more instruction to Bollinger to improve its operations. *See, e.g.*, *id.* at 23:2-24:1, PageID.484-85; *id.* at 40:16-41:7, PageID.501-02; *id.* at 51:2-11, PageID.512. This included testimony that Bollinger's counsel elicited from Bollinger's CEO about the CEO lacking authority to call a board meeting—which reinforced the false narrative that it was Mullen's fault that Bollinger was in financial distress—*see id.* at 53:22-54:2, PageID.514-15, and statements about Michery allegedly ignoring the CEO's requests to schedule board meetings, *see id.* at 70:10-18, PageID.531.

- A string of unrebutted attacks on Mullen for allegedly not paying monies promised to Bollinger and not having the financial resources to support Bollinger. *See, e.g., id.* at 31:13-16, PageID.492; *id.* at 36:17-19, PageID.497; *id.* at 75:6-76:7, PageID.496-97; *id.* at 76:8-14, PageID.537.

- Plaintiff's statement to this Court that "there's not going to be $10 million ever to pay back [Plaintiff's] note." *Id.* at 85:19-20,

PageID.546.

- Discussion of an order in a federal court proceeding in New York that this Court was led to believe was still applicable and constrained Mullen from providing further funding to Bollinger. *See id.* at 94:6-22, PageID.555.

Based on this incomplete record, this Court found a receivership necessary. *See, e.g.*, *id.* at 94:23-95:12, PageID.555-56. But, as outlined below and further described in the proposed motion for reconsideration attached as an exhibit to this motion, evidence not presented at the hearing contradicts those allegations.

At the end of the hearing, this Court asked Bollinger's attorney point blank: "Do you think it might be in the best interest of Bollinger Motors to go into receivership so that it could possibly gain funding through a sale as a going concern as was described?" 5/7/25 Hr'g Tr. at 93:4-7, ECF No. 34, PageID.554. Instead of saying, "No" and explaining why a receivership was not warranted (as Mullen would certainly have wanted him to do), Bollinger's attorney responded, "I think that is a great question. It's a tough question for me to answer." *Id.* at 93:8-9, PageID.554. He went on to explain that "[a]s a lawyer" he has to "be very careful" because he did not "have the direction from [Bollinger's] chairman to stipulate to that and he does not think that it's in the best interest of the company." *Id.* at 93:9-16, PageID.554. And he ended with the noncommittal answer that "only time will tell" whether a

receiver would be a good option because "[t]here's no crystal ball on what a receiver will . . . be able to do" and "[t]here's no crystal ball on Mullen's ability to fund." *Id.* at 93:17-24, PageID.554.

The proposed receiver also testified that, if appointed, he intended to sell Bollinger "as a going concern." *Id.* at 81:22-83:1, PageID.542-44. He explained that he talked to Plaintiff before the hearing about Plaintiff's "commit[ment]" to provide funding "to try and keep the company afloat to sell it as a going concern." *Id.* at 83:2-10, PageID.544. And he specifically noted that, in his "discussion" with Plaintiff, Plaintiff offered to "tak[e] care" of paying "the employees that have been . . . working at the company for a significant period of time." *Id.* at 83:17-21, PageID.544. According to the proposed receiver, this offer from Plaintiff was "critical to any ongoing sale to preserve the workforce." *Id.* at 83:21-84:9, PageID.544-45.

### D.   An Imminent Potential Sale Threatens Mullen's Majority Stake in Bollinger.

Soon after the receiver was appointed, Plaintiff went onsite to Bollinger with the receiver and reinforced a false narrative for employees that he was going to save their jobs by bankrolling the payroll while the receiver liquidates sufficient assets to pay him and then facilitates a sale of Bollinger. Michery Decl. ¶¶ 23-24. Then, despite permitting Plaintiff, a minority shareholder, to be on-site, the receiver instructed Mullen, the majority shareholder, that it had "no valid basis for having

agents onsite" at Bollinger and directed it to "immediately cease . . . seeking access

to" Bollinger facilities, absent agreement of the receiver or a Court order. *Id.* ¶ 24;

Ex. C to Michery Decl. What's more, any means for Bollinger to appeal the

receiver's appointment may have been restricted, because Mullen is barred from

directing "the actions of Bollinger or its employees," presumably including counsel,

and the receiver has requested that the Senior Vice President of Legal Affairs for

Bollinger step down because she is also employed in Mullen's business and legal

affairs office. *Id.* Therefore, Mullen moves to intervene as of right to ask this Court

to reconsider the receivership in light of the evidence not presented at the hearing

(as detailed in the attached proposed motion).

## III.   <u>LEGAL STANDARDS</u>

Under Federal Rule of Civil Procedure 24(a):

> On timely motion, the court must permit anyone to intervene who: . . .
> (2) claims an interest relating to the property or transaction that is the
> subject of the action, and is so situated that disposing of the action may
> as a practical matter impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). To meet this standard, a proposed intervenor must show that

(1) the motion is timely; (2) the proposed intervenor has a substantial legal interest

in the case's subject matter; (3) the proposed intervenor's ability to protect that

interest may be impaired in the absence of intervention; and (4) existing parties may

not adequately represent the proposed intervenor's interest. *Grainger v. Ottawa*

*Cnty.*, 90 F.4th 507, 513 (6th Cir. 2024) (citing *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007)). These elements are to be "construed broadly in favor of the applicants." *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1246 (6th Cir. 1997) (quotation marks omitted).

## IV.   <u>ARGUMENT</u>

### A.   **Intervention Is Mandatory Because Mullen Has an Interest in Preserving Its Majority Stake in Bollinger and the Existing Parties <u>Do Not Adequately Represent That Interest.</u>**

This situation falls squarely within the test for Rule 24(a) mandatory intervention. First, Mullen, as the majority shareholder, has a financial interest in Bollinger. Second, as the majority shareholder, the receivership impairs or impedes Mullen's ability to protect its interest in Bollinger. Third, as shown at the May 7 hearing, at which neither party presented evidence that supported Mullen's position, the existing parties did not and do not adequately represent Mullen's interest in Bollinger. And finally, this motion to intervene is timely because Mullen only recently learned that its interests were not adequately represented and that Plaintiff might be attempting to wrest control of Bollinger away from Mullen. Therefore, this Court should grant the motion to intervene.

#### 1.   **This Motion Is Timely Because Mullen Only Recently Learned that the Existing Parties Do Not Adequately Represent Its Interests.**

On the Sixth Circuit's first requirement for mandatory intervention

(timeliness), Mullen timely moved for intervention after it learned it could no longer count on Bollinger to defend its legal interests as a majority shareholder and that the receiver may soon sell Bollinger to a competitor. Timeliness is evaluated based on all relevant circumstances, including:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor or intervention.

*United States v. Michigan*, 68 F.4th 1021, 1024-25 (6th Cir. 2023). Here, as discussed below, all relevant circumstances point toward the timeliness of this motion:

*The Point to Which the Suit Has Progressed*: This suit is in its very early stages. Bollinger just filed its answer on April 24. ECF No. 21. The parties' joint Rule 26(f) discovery plan is not due until May 21. ECF No. 24. And the receiver was just appointed on May 7. ECF No. 29; ECF No. 32.

*The Purpose for Which Intervention Is Sought*: Mullen seeks to intervene for a vital purpose—to prevent losing its majority stake in Bollinger, and its corresponding investment of nearly $180 million, via an involuntary sale.

*The Length of Time Preceding the Application during Which the Proposed Intervenors Knew or Should Have Known of Their Interest in the Case*: Mullen did

not know it had an interest *independent* of Bollinger's interest until the evidentiary hearing and the beginning of the receivership, which together laid bare that Mullen could not rely on Bollinger to represent its interests and that it is facing an imminent threat of losing its majority stake via a sale of Bollinger over its objection. At the hearing, Plaintiff and Bollinger's officers (Plaintiff's witnesses at the hearing) presented a distorted picture of Mullen as the "bad actor" that allegedly caused Bollinger's financial distress. But the following evidence not introduced at the hearing disproves that narrative:

- Contrary to the testimony blaming Mullen for not scheduling board meetings, there was no required schedule for board meetings, other than an annual meeting, and the three non-Mullen directors on the Board could have called a meeting at any time. Michery Decl. ¶ 29, Ex. D to Michery Decl. at 6. In their business judgment, the board members apparently decided that there was no need to schedule board meetings because they were receiving detailed weekly updates from Bollinger's leadership about all material aspects of Bollinger's operations and quarterly financial statements of Bollinger and because Mullen held weekly meetings that included all key Bollinger officers. *See* Michery Decl. ¶¶ 29-32.

- In contrast to the testimony about Mullen allegedly being unwilling and unable to fund Bollinger, Mullen has invested over $178 million into Bollinger to keep it operating and remains committed to funding it. Michery Decl. ¶¶ 7, 13, Ex. D to Michery Decl. In fact, Mullen attempted to implement a plan to restructure Bollinger to make it profitable, including by right-sizing staff, moving Bollinger's manufacturing to Mullen's plant, and cross-selling Mullen and Bollinger products. *Id.* ¶¶ 33-39. But Plaintiff and various Bollinger employees loyal to Plaintiff scuttled those efforts, e.g., by opposing the move to Mullen's plant with a cost estimate that was inexplicably four times that of Mullen's consultants and delaying reductions of duplicative positions. *Id.*

- At the hearing, Plaintiff argued that Bollinger would never be able to repay his $10 million loan because of Mullen's allegedly poor financial position. *See* 5/7/25 Hr'g Tr. at 85:19-20, ECF No. 34, PageID.546. But Mullen has secured a commitment from the same investor that has invested over $800 million in Mullen to pay off Plaintiff's entire loan $10 million loan in exchange for certain conditions. Michery Decl. ¶ 7.

- Regarding the New York federal court orders this Court was led to believe constrained Mullen from providing further funding to

15

Bollinger, *see* 5/7/25 Hr'g Tr. at 94:6-22, ECF No. 34, PageID.555, Mullen has since settled that matter in principle, and the plaintiff in that matter has released Mullen from those orders. Michery Decl. ¶ 9; Ex. B to Michery Decl., 5/13/25 Letter to Mullen.

The fact that Bollinger's counsel did not oppose the receivership, as Mullen desired, strongly suggests that Bollinger was being directed by interests other than Mullen at the time of the hearing. *See* 5/7/25 Hr'g Tr. at 93:4-24, ECF No. 34, PageID.554. In other words, Mullen was not aware that Bollinger would not effectively advocate for Mullen's interests as Bollinger's majority shareholder until after the hearing.

The hearing—and the events that followed shortly thereafter—were also the moment that Mullen realized it was facing an imminent threat of losing its majority stake in Bollinger. At the hearing, the then-proposed receiver testified that he and Plaintiff had already discussed a plan for Plaintiff to fund Bollinger's payroll to put the receiver in the best place to sell Bollinger. *See id.* at 81:22-84:9, PageID.542-44. And then, right after this Court appointed the receiver, Plaintiff visited Bollinger with the receiver and employees were told he would pay their salaries while the receiver sells Bollinger. Michery Decl. ¶ 13, Ex. D to Michery Decl. Mullen can no longer direct Bollinger and its counsel to appeal the Receivership Opinion and Order, and the receiver has not solicited Mullen's views about any alternative

solutions for Bollinger's future. *Id.*; Ex. C to Michery Decl., 5/9/25 Letter from Receiver's Counsel to Mullen. It was only at this point that Mullen realized it could not rely on its status as Bollinger's majority shareholder to protect its ownership interest in Bollinger—and therefore it needed to intervene on its own.

*The Prejudice to the Original Parties due to the Proposed Intervenors' Failure to Promptly Intervene after They Knew or Reasonably Should Have Known of Their Interest in the Case*: As detailed above, Mullen has sought to promptly intervene after it realized that it had an interest independent of Bollinger's that needed to be protected. But even if this Court were to find otherwise (it should not), intervention now would not prejudice the parties. As this Court pointed out during the initial hearing at which it denied Plaintiff's first motion for a receivership, "due process" and "basic fairness" require providing an opportunity for "both sides [to] present their evidence" "before the Court makes such a significant decision under equity as to appoint a receiver." 3/31/25 Hr'g Tr. at 29:20-30:12, ECF No. 13, PageID.192-93; *id.* at 34:2-5, PageID.197; *id.* at 42:6-9, PageID.205. It is not prejudicial to any party to allow a full presentation of the evidence regarding the extraordinary relief of appointing a receiver. In fact, the true prejudicial effect would be if Mullen were to lose its entire ownership stake in Bollinger, while allowing Plaintiff, as a minority shareholder, to effectively direct a sale, without this Court considering the full range of evidence from all affected parties.

*The Existence of Unusual Circumstances Militating Against or in Favor of Intervention*: The potential loss of Mullen's majority stake in Bollinger via an imminent involuntary sale carried out at the direction of a former board member and CEO is an unusual circumstance pointing strongly toward allowing Mullen to intervene to protect its ownership interest.

Since all relevant considerations indicate that this motion is timely, the first element of mandatory intervention is satisfied.

### 2. Mullen's Substantial Legal Interest in Preserving Its Majority Stake in Bollinger May Be Impaired Absent Intervention Because the Existing Parties Will Not Protect It.

Mullen also meets the remaining elements of mandatory intervention, which, considered together, require that it have a substantial legal interest in the case and that that interest will be impaired absent intervention because the existing parties will not protect it. *See Grainger*, 90 F.4th at 513.

The Sixth Circuit views the question of whether a proposed intervenor has a "substantial legal interest" expansively; it has "noted that an intervenor need not have the same standing necessary to initiate a lawsuit . . . and cited with approval decisions of other courts rejecting the notion that Fed. R. Civ. P. 24(a)(2) requires a specific legal or equitable interest." *Mich. State AFL-CIO*, 103 F.3d at 1245 (cleaned up); *see also Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999). Mullen easily satisfies that low bar because it has a substantial legal interest in not losing its

majority stake in Bollinger via the receiver selling Bollinger to a competitor.

With respect to the last two elements of the mandatory intervention test, a proposed intervenor "must show only that impairment of its substantial legal interest is possible if intervention is denied, a burden that is minimal." *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 787 (6th Cir. 2007) (cleaned up). In other words, "it is sufficient that the movant prove that representation *may* be inadequate." *Mich. State AFL-CIO*, 103 F.3d at 1247 (cleaned up) (emphasis added). The proposed intervenor "is not required to show that the representation will *in fact* be inadequate." *Id.* (emphasis added). As illustrated by the testimony at the hearing and the events immediately following it (in which Bollinger stopped taking direction from Mullen), Bollinger not only may not—but has affirmatively refused to— protect Mullen's interest in avoiding an involuntary sale.

> **B.    A Shortened Briefing Schedule Is Warranted Because of the Imminent Risk that Mullen May Lose its Majority Stake in Bollinger.**

The parties' responses to this motion would normally be due within 14 days. E.D.Mich. LR 7.1(e)(1)(A). Because the receiver is already moving forward with a plan to sell Bollinger and Mullen currently faces an imminent risk that it will involuntarily lose its majority stake in Bollinger, good cause exists for this Court to order the parties to file their responses, if any, within 7 days.

## V.    <u>**CONCLUSION**</u>

For these reasons, Mullen respectfully requests that this Court:

(1)    grant this motion and permit it to intervene in this matter in order to oppose Plaintiff's Count II for Appointment of Receiver;

(2)    allow it to file the attached proposed motion (Ex. 1); and

(3)    order the parties to file a response, if any, to this motion within 7 days.

Respectfully submitted,

DYKEMA GOSSETT PLLC

Dated: May 20, 2025

By: *s/ Jennifer L. Beidel*

Jennifer L. Beidel (P86645)
Brian M. Moore (P58584)
Mark Chutkow (P86076)
39577 Woodward Ave, Suite 300
Bloomfield Hills, MI 48304
Telephone: (248) 203-0506; (248) 203-0772; (248) 203-0715
JBeidel@dykema.com
BMoore@dykema.com
MChutkow@dykema.com

Kyle M. Asher (P80359)
201 Townsend Street, Suite 900
Lansing, MI 48933
Telephone: (517) 374-9151
KAsher@dykema.com

Andrew T. VanEgmond (P82134)
2723 South State St, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 214-7603
AVanegmond@dykema.com

*Attorneys for Proposed Intervenor Mullen Automotive, Inc.*

126901.000001 4901-4284-0899.25

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **ROBERT BOLLINGER,** | Case No. 2:25-cv-10790-TGB-APP |
| *Plaintiff*, | Hon. Terrence G. Berg |
| v. | <u>**ORAL ARGUMENT REQUESTED**</u> |
| **BOLLINGER MOTORS, INC.,** | |
| *Defendant*. | |

**PROPOSED INTERVENOR MULLEN AUTOMOTIVE, INC.'S
EMERGENCY MOTION FOR RECONSIDERATION OF THE OPINION
AND ORDER GRANTING PLAINTIFF'S RENEWED MOTION TO
APPOINT RECEIVER OR, IN THE ALTERNATIVE, FOR
<u>MODIFICATION OF THE ORDER APPOINTING RECEIVER</u>**

Proposed Intervenor Mullen Automotive, Inc. ("Mullen") respectfully seeks emergency reconsideration of this Court's May 8, 2025 Opinion and Order Granting Plaintiff's Renewed Motion to Appoint Receiver (ECF No. 32) or, in the alternative, modification of this Court's May 7, 2025 Order Appointing Receiver (ECF No. 29). For the reasons explained in the accompanying brief, which is incorporated herein, this Court should grant Mullen's motion for reconsideration, and deny Plaintiff's request for a receiver. Alternatively, this Court should modify and limit the scope of the receivership to, among other things, prevent a sale of Bollinger Motors, Inc. ("Bollinger"). In the event this Court elects to modify the scope of the receivership,

a proposed redline order is attached as Exhibit A. And, in the meantime, this Court should stay the receivership order while it considers this motion to prevent further harm to Mullen's interests.

On May 16, 2025, counsel for Mullen contacted the parties via email to inform them of the relief requested and determine whether the parties would concur. Plaintiff's counsel advised via email that Plaintiff does not concur in the relief requested. During and after a subsequent meet-and-confer call on May 16, 2025, however, the parties have worked toward a resolution. Given the emergency nature of the relief requested (which would avoid a potential involuntary sale of Defendant

Bollinger Motors, Inc. before Mullen can obtain relief), Mullen submits this motion

while those discussions are ongoing.          DYKEMA GOSSETT PLLC


Dated: May 20, 2025                    By: *s/ Jennifer L. Beidel*
                                            Jennifer L. Beidel (P86645)
                                            Brian M. Moore (P58584)
                                            Mark Chutkow (P86076)
                                            39577 Woodward Ave, Suite 300
                                            Bloomfield Hills, MI 48304
                                            Telephone: (248) 203-0506; (248) 203-
                                            0772; (248) 203-0715
                                            JBeidel@dykema.com
                                            BMoore@dykema.com
                                            MChutkow@dykema.com

                                            Kyle M. Asher (P80359)
                                            201 Townsend Street, Suite 900
                                            Lansing, MI 48933
                                            Telephone: (517) 374-9151
                                            KAsher@dykema.com

                                            Andrew T. VanEgmond (P82134)
                                            2723 South State St, Suite 400
                                            Ann Arbor, MI 48104
                                            Telephone: (734) 214-7603
                                            AVanegmond@dykema.com

                                            *Attorneys for Proposed Intervenor Mullen*
                                            *Automotive, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

**ROBERT BOLLINGER,**

    *Plaintiff*,

    v.

**BOLLINGER MOTORS, INC.,**

    *Defendant*.

Case No. 2:25-cv-10790-TGB-APP

Hon. Terrence G. Berg

**ORAL ARGUMENT REQUESTED**

**PROPOSED INTERVENOR MULLEN AUTOMOTIVE, INC.'S BRIEF IN
SUPPORT OF EMERGENCY MOTION FOR RECONSIDERATION OF
THE OPINION AND ORDER GRANTING PLAINTIFF'S RENEWED
MOTION TO APPOINT RECEIVER OR, IN THE ALTERNATIVE, FOR
MODIFICATION OF THE ORDER APPOINTING RECEIVER**

# **TABLE OF CONTENTS**

**Page**

CONCISE STATEMENT OF ISSUES PRESENTED .............................................v

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF
REQUESTED ...........................................................................................vi

INTRODUCTION ...........................................................................................1

BACKGROUND ...........................................................................................4

I.     Mullen Acquires a Majority Interest in Bollinger, and Plaintiff Cedes
       His Officer and Director Positions. ..................................................4

II.    Bollinger Fails to Make a $125,000 Payment to Plaintiff, and Plaintiff
       Accelerates the Full $10 Million Loan. ............................................5

III.   Plaintiff Files This Lawsuit, and Seeks Appointment of a Receiver, on
       the Premise That Plaintiff Cannot Recover the $10,000,000. ..........6

IV.    Plaintiff's Motion to Appoint a Receiver was Initially Denied Due to
       the Lack of Evidence of Fraud or Imminent Danger of Property
       Dissipation. ......................................................................................7

V.     Plaintiff Files a Renewed Motion That Continues to Lack Evidence of
       Fraud or Imminent Danger of Dissipation of Property. ...................8

VI.    This Court Issues a Protective Order. ...............................................9

VII.   This Court Appoints a Receiver Despite the "Less Compelling"
       Evidence of Fraud, After Finding "Mullen Will Not" Protect Plaintiff's
       Claim. ...............................................................................................10

VIII.  Control Is Stripped From Bollinger's Board. ..................................12

LEGAL STANDARDS ...............................................................................13

I.     Motion for Reconsideration Standards ............................................13

II.    Receivership Standards....................................................................14

ARGUMENT ...............................................................................................15

I.     New Facts Introduced by Mullen Warrant a Different Outcome.....15

II.    This Court Should Reconsider Its Order Finding the Receivership
       Standards Met. .................................................................................19

       A.    There Are Less Drastic Measures Available That Will Protect
             Plaintiff's Property. ...............................................................20

i

B.     There is No Evidence of Fraudulent Conduct.....................................21

III.   At a Minimum, This Court Should Modify the Receivership Order ............22

IV.   This Court Should Stay the Receivership Order Pending an Evidentiary Hearing..................................................................................................22

CONCLUSION ....................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A. Philip Randolph Inst. v. Husted*,
    907 F.3d 913 (6th Cir. 2018) ........................................................................23, 24

*GEM Yield Bahamas Limited v. Mullen Automotive, Inc.*,
    S.D.N.Y. Case No. 1:24-cv-00120 ...............................................................11, 15

*Hill v. Cohen*,
    40 F.4th 101 (3d Cir. 2022) ...............................................................................21

*Hosn v. Fly Baghdad Airline*,
    No. 20-13442, 2021 U.S. Dist. LEXIS 185204 (E.D. Mich. Sept. 28, 2021)
    ........................................................................................................................13

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
    945 F.2d 150 (6th Cir. 1991) .............................................................................23

*Motley v. Metro Man I*,
    702 F. Supp. 3d 596 (E.D. Mich. 2023) .....................................................14, 20

*Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*,
    630 F. App'x 410 (6th Cir. 2015) ..........................................................14, 15, 19

*Plastic Omnium Auto Inergy Indus. v. MCC Dev., Inc.*,
    No. 21-cv-11141, 2023 U.S. Dist. LEXIS 152377 (E.D. Mich. Aug. 10,
    2023) ..........................................................................................................14, 20

*Southern Glazer's Distribs. of Ohio LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) .............................................................................24

*WB Music Corp. v. Royce Int'l Broad Corp.*,
    47 F.4th 944 (9th Cir. 2022) .............................................................................17

RULES

Civ. R. 7.1(h)(2)(C)......................................................................................................3

Local Rules 7.1(h)(2)(A) ..............................................................................................v

iii

Local Rules 7.1(h)(2)(C)..............................................................................................v

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.     Should this Court grant Mullen's emergency motion for reconsideration, and deny Plaintiff's motion to appoint a receiver, in light of the facts introduced by Mullen?

**Mullen Answers**: Yes.

2.     Alternatively, should this Court modify the scope of the receivership order to prevent a sale of Bollinger?

**Mullen Answers**: Yes.

3.     Should this Court stay the effect of the receivership order while it considers Mullen's arguments, to prevent the irreparable harm to Mullen if its majority-owned business is sold against its wishes?

**Mullen Answers**: Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF REQUESTED

In support of its arguments, Mullen relies on Eastern District of Michigan Local Rules 7.1(h)(2)(A) and (C), along with the authorities cited in the accompanying briefing.

## **INTRODUCTION**

Defendant Bollinger Motors, Inc. ("Bollinger") was a few days late in making a $125,000 interest-only loan payment to Bollinger for its founder, current minority shareholder, and former board member, Plaintiff Robert Bollinger ("Plaintiff"), who then accelerated the full $10 million loan. Proposed Intervenor Mullen Automotive, Inc. ("Mullen")—who invested nearly $150 million to become Bollinger's majority shareholder in 2022, and an additional $30 million over the past year, including millions since Plaintiff's Complaint was filed—remains willing and able to secure funding to pay the full $10 million Plaintiff alleges is due under the note. Yet Plaintiff brought this suit seeking both repayment of the $10 million and the emergency appointment of a receiver on the (incorrect) premise that he otherwise would not be able to be repaid. But what Plaintiff truly wanted was an order "effectively plac[ing] Plaintiff, a minority shareholder of the Company," rather than Mullen, "in control of" Bollinger. Resp. to Renewed Mot. at 3, ECF No. 20, PageID.323; Opinion at 6, ECF No. 32, PageID.450 ("[The receiver] testified that *with the assistance of Plaintiff*, he hoped that Defendant could be sold as a going concern to preserve value for Defendant's secured creditor, Plaintiff . . ." (emphasis added)); Renewed Mot. to Appoint Receiver at 9, ECF No. 17 ("Moreover, Robert Bollinger has committed to fund Bollinger Motors' payroll to determine if the receiver can sell the Company as a going concern.").

This Court initially declined to grant the requested relief, finding no concrete evidence of fraudulent conduct. 3/31/25 Hr'g Tr. at 5:16-20 ("[Y]ou need to show fraud and you didn't do it in your briefing."). Nor was this Court "convinced . . . that there's evidence of imminent danger of the destruction or dissipation of property." *Id.* at 30:9-12. And while this Court found a "serious question" about "whether or not this company is going to be able to pay this debt"—a finding resulting from Plaintiff's failure to disclose to the Court material facts—it also found that "just because they can't pay this debt, that doesn't mean that the whole company goes into receivership." *Id.* at 30:13-19. Since then, nothing has changed that would justify the extraordinary remedy of a receivership. Plaintiff has yet to show fraudulent conduct. Mullen has continued to fund Bollinger. ECF No. 20-2 (showing $1,725,000 in payments made since the March 31 hearing). And this Court issued a Protective Order that would ensure Bollinger's assets are not improperly disbursed while the merits of Plaintiff's claims are litigated. ECF No. 27.

Notwithstanding, after a May 7, 2025 evidentiary hearing, this Court appointed a receiver. Since that time, the receiver—"with the assistance of Plaintiff"—has already indicated a desire to sell Bollinger, contrary to the wishes of Mullen, the majority shareholder. In light of this background, Mullen now seeks reconsideration of this Court's Opinion and Order for three reasons.

*First*, Mullen introduces new facts via the attached declaration warrant which a different outcome. E.D. Mich. L. Civ. R. 7.1(h)(2)(C). This Court's decision to appoint a receiver turned on its finding that "Defendant cannot, and Mullen will not" protect Plaintiff's claim. The new facts render this finding inaccurate. Mullen has secured a commitment from an investor to make Plaintiff whole. And a primary obstacle to this Court's finding that Mullen was unable to make such a payment – the restraining order in the Southern District of New York – has been removed since the hearing. Put simply, there is no need for a receiver to ensure Plaintiff is paid. Nor should Plaintiff, as a non-officer or director and minority shareholder, be permitted to assist the receiver in liquidating a company that Mullen, the majority shareholder, plans to continue operating, based on a purported need to protect other creditors.

*Second*, even without these new facts, this Court's initial decision denying the appointment of a receiver was correct. There is nothing to indicate that Bollinger is engaging in fraudulent conduct that will endanger the assets of Plaintiff or others while this case is litigated. And, this Court's prior Protective Order demonstrates there are far less drastic remedies than the appointment of a receiver to immediately sell Bollinger against the majority shareholder's wishes that will ensure assets and collateral remain protected.

*Third*, even if this Court elects not to reconsider the appointment of a receiver, it should modify and limit the scope of the Receivership Order to prevent the receiver

from selling Bollinger's assets against Mullen's wishes. In the event the Receiver later determines that such extraordinary action is warranted, the Receiver can move this Court to expand its authority. Mullen has a plan that will allow Bollinger to continue to operate. Mullen should have a say in the matter. Once any sale occurs, that bell cannot be unrung.

## BACKGROUND

### I.   Mullen Acquires a Majority Interest in Bollinger, and Plaintiff Cedes His Officer and Director Positions.

Plaintiff is the founder and former majority owner of Bollinger. Compl. ¶¶ 5, 9, ECF No. 1, PageID.2. In September 2022, Mullen purchased a majority interest in Bollinger for $148.2 million. *Id.* ¶ 10;Declaration of David Michery, **Ex. B**, ¶ 4. Plaintiff initially "remained . . . as Chief Executive Officer of Bollinger Motors and a member of its Board of Directors." Compl. ¶ 11. But eventually, the relationship between Plaintiff and Bollinger's new ownership deteriorated, and Plaintiff ceded his leadership roles in the summer of 2024. Michery Decl. ¶¶ 21-22; Compl. ¶¶ 13-14.

As of today, Mullen is an approximately 73% majority shareholder of Bollinger. Michery Decl. ¶ 5. Despite no longer serving as an officer or director, and being merely a minority shareholder, Plaintiff has maintained relationships with key Bollinger leadership and sought to influence the direction of Bollinger, including by

4

bringing a Mullen competitor to the table as a potential purchaser. Michery Decl. ¶ 26 ; Compl. ¶ 17.

## II. Bollinger Fails to Make a $125,000 Payment to Plaintiff, and Plaintiff Accelerates the Full $10 Million Loan.

On October 24, 2024, Plaintiff "loaned $10,000,000 to Bollinger," "pursuant to an Amended and Restated Secured Promissory Note." Compl. ¶ 18; Note, ECF No. 1-2. Bollinger "was required to make interest-only payments" according to a "payment schedule attached to the Note." *Id.* ¶ 20; Note, ECF No. 1-2, PageID.31. If Bollinger defaulted by failing to make a timely payment, the "aggregate principal amount of th[e] Note" would "become immediately due and payable[.]" Note at 6, ECF No. 1-2, PageID.23.

Bollinger made the first three payments on time. Michery Decl. ¶ 15. And, although Bollinger was struggling financially, Mullen continued to provide millions to Bollinger weekly and committed in writing to continue funding it. Michery Decl. ¶¶ 7, 13. Plaintiff alleges, however, that Bollinger defaulted under the Note by failing to make a $125,000 payment to Plaintiff on February 28, 2025, despite the fact that Mullen paid Bollinger $125,000 to provide to Plaintiff. Compl. ¶ 27, PageID.5. Within days of that default, Plaintiff "accelerated all amounts due under the Note." *Id.* ¶ 29.

5

**III.   Plaintiff Files This Lawsuit, and Seeks Appointment of a Receiver, on the Premise That Plaintiff Cannot Recover the $10,000,000.**

Plaintiff asserted a breach of contract claim seeking to recover $10 million. Compl. ¶¶ 77-82, PageID.12. He also sought the emergency appointment of a receiver. *Id.* ¶¶ 83-92; Emergency Mot. to Appoint Receiver, ECF No. 3.

As support for this extraordinary remedy, Plaintiff cited a "danger that the assets pledged as security for the Note will be removed from jurisdiction of the court, lost, concealed, materially injured or damaged, diminished, or mismanaged." Compl. ¶ 33. That danger rested entirely on hypothetical criminal conduct. Plaintiff claimed Bollinger has electric vehicle assets "in excess of $5 million" that "could be driven away from Bollinger Motors' storage facility by any employee with access to the keys." *Id.* ¶ 59. Plaintiff also posited that a "disgruntled employee, director, officer, stockholder, or vendor could transfer the valuable Bollinger Motors intellectual property and trade secrets to themselves in an attempt to profit from the hard work of the Company." *Id.* ¶ 70. Based on this speculation, with zero evidentiary support, Plaintiff claimed the "appointment of a receiver over Bollinger Motors' assets is necessary to protect such assets from dissipation, damage, destruction, concealment, disposal, or loss." *Id.* ¶ 72.

**IV.   Plaintiff's Motion to Appoint a Receiver was Initially Denied Due to the Lack of Evidence of Fraud or Imminent Danger of Property Dissipation.**

This Court initially held a hearing on Plaintiff's emergency motion to appoint a receiver on March 31, 2025. At that hearing, this Court asked Plaintiff's counsel, "[w]hat about Mullen Motors, can't they provide money?" 3/31/25 Hr'g Tr. at 12:19-20, ECF No. 13, PageID.175. Plaintiff responded that Mullen "asserted that they can. We have reason to believe that that may not be entirely accurate . . . If they had access to funding, they'd pay the debt, they'd pay Mr. Bollinger in full . . . There's no guarantee that any other money is going to be forthcoming from Mullen." *Id.* at 12:21-13:11, 14:9-22. This Court also asked whether Plaintiff had any actual "evidence of fraud," stating "you need to show fraud and you didn't do it in your briefing." *Id.* at 5:16-20. Plaintiff did not provide a clear answer, likely because there is no evidence of fraud to be had.

After hearing argument, this Court declined to appoint a receiver. *Id.* at 30:2-3, PageID.193. It found, "there's not enough evidence to show a probability of fraudulent conduct. I have no evidence of that other than your bald statements." *Id.* at 30:5-8. Likewise, the Court was not "convinced . . . that there's evidence of imminent danger of the destruction or dissipation of property." *Id.* at 30:9-12. And although this Court found a "serious question about the insolvency of" Bollinger and whether it could "pay this debt," it concluded that, "just because they can't pay this debt, that doesn't mean that the whole company goes into receivership, not based on

7

what we have in front of us now." *Id.* at 30:13-19. This Court thus denied the motion

without prejudice. Minute Entry, ECF No. 12.

## V. Plaintiff Files a Renewed Motion That Continues to Lack Evidence of Fraud or Imminent Danger of Dissipation of Property.

Thereafter, Plaintiff filed a renewed motion to appoint a receiver. ECF No.

17. Like the initial motion, this renewed motion claimed a "receiver is necessary in

order to preserve the assets pledged for the repayment of the $10 million loan made

by Robert Bollinger," even though Mullen had already committed to its continued

funding of Bollinger to the tune of millions of dollars. Renewed Mot. at 4, PageID.

275. And just as before, Plaintiff did not provide any concrete evidence of fraud or

risk of dissipation of assets. *See generally id.* Indeed, Plaintiff's only attempt to

imply improper conduct was to claim that Bollinger was attempting to "sell[]

vehicles pledged as security to Robert Bollinger." *Id.* at 8, PageID.279. Plaintiff

claimed Bollinger was planning to use these sales to "fund [Bollinger's] day-to-day

operations" rather than pay Plaintiff. *Id.* However, upon learning of this issue,

Bollinger placed the money from the sales in escrow. Michery Decl. ¶ 16.

Apart from that allegation, Plaintiff primarily argued that Bollinger was on

the verge of insolvency, and that a receiver—following Plaintiff's direction—could

manage Bollinger's affairs better than Bollinger and its majority shareholder,

Mullen. Renewed Mot. at 4 n.1, PageID.275 (floating the idea that, "with the timely

appointment of a receiver, Bollinger could still reasonably pursue a purchaser with

the financial assistance of Robert Bollinger"); *id.* at 7 ("the only viable solution is for the Court to immediately appoint a receiver and empower the receiver, funded in part, by resources Robert Bollinger is prepared to supply, to take immediate action to potentially salvage the Company not only to pay its debts, but also to potentially save the jobs of 130 individuals who are employed by the Company"); *id.* at 9 ("Moreover, Robert Bollinger has committed to fund Bollinger Motors' payroll to determine if the receiver can sell the Company as a going concern.").

In essence, Plaintiff was "requesting the Court to effectively place Plaintiff, a minority shareholder of the Company, in control of" Bollinger. Resp. to Renewed Mot. at 3, ECF No. 20, PageID.323.

## VI.    This Court Issues a Protective Order.

Days before the evidentiary hearing, this Court issued a Protective Order. ECF No. 27. The Protective Order required Bollinger to "take all actions necessary to secure and safeguard its assets, including any and all assets defined as 'Collateral'" under the Note. *Id.* at 1, PageID.414. It prohibited Bollinger from disbursing or dissipating assets without Court approval. *Id.* at 2. It allowed Bollinger to continue selling vehicles in arms-length transactions to non-interested parties, provided that the proceeds were placed in escrow. *Id.* And it allowed Bollinger to continue making payments "in the ordinary course of its business, including payroll," so long as the "payments are necessary for the continued operation of Bollinger" and Bollinger

provided "reports of such payments to Plaintiff and Plaintiff's counsel on a weekly basis." *Id.* This Court also directed Bollinger to file notices in any other actions brought against Bollinger to inform the other courts and parties of Plaintiff's secured interest. *Id.* at 2-3.

## VII. This Court Appoints a Receiver Despite the "Less Compelling" Evidence of Fraud, After Finding "Mullen Will Not" Protect Plaintiff's Claim.

At the May 7 evidentiary hearing, Plaintiff again argued that a receiver was needed because "there's not going to be $10 million ever to pay back [Plaintiff's] note." 5/7/25 Hr'g Tr. at 85:19-20, ECF No. 34, PageID.546. Mullen's steady weekly funding stream of millions of dollars into Bollinger was not emphasized.

This Court then issued its Opinion and Order Granting Plaintiff's Renewed Motion to Appoint Receiver ("Opinion") appointing a receiver. ECF No. 32. This Court's analysis focused primarily on "undisputed" testimony that neither Mullen nor Bollinger would be able to repay Plaintiff or other unsecured creditors.[1] Tise Court cited "undisputed testimony" that Mullen was "provid[ing] barely enough" funding "to meet the Company's minimum requirements to remain in operation." *Id.* at 4, PageID.448. And it questioned whether Mullen would be able to provide

---

[1] The Court also pointed to other "undisputed actions of Mullen" that "give rise to some concerns," such as the failure to hold board meetings and Mullen's provision of "just enough money to stave off total failure, but not enough money to pay the company's ever-growing list of creditors." *Id.* at 10. The Court concluded that, "[w]hile the conduct of Mullen here does not rise to the level of fraud, it hardly engenders trust either." *Id.* at 11.

funding going forward in light of an order "prohibit[ing]" Mullen from "transferring funds to other entities as the result of a judgment issued by the United States District Court for the Southern District of New York" in *GEM Yield Bahamas Limited v. Mullen Automotive, Inc.*, S.D.N.Y. Case No. 1:24-cv-00120 (the "*GEM* Litigation"). *Id.* at 5, 10. This Court stated that "[a] receiver would protect Plaintiff's claim. Defendant cannot, and Mullen will not." *Id.* at 11. It determined that, absent a receiver, "Defendant will continue to accrue debt that it will not be able to pay," meaning "Plaintiff's property will be lost." *Id.* at 12-13. And it found that, "[b]y the time Plaintiff can secure a judgment, there may be no assets left and nothing against which to take a judgment." *Id.* at 13.

Thus, although this Court reasoned that the evidence of "fraudulent conduct that will frustrate Plaintiff's claim" was "less compelling," it appointed the receiver. *Id.* at 9. This Court granted the receiver "broad powers . . . which include the option to liquidate Defendant." *Id.* at 14. And it noted that the receiver would carry out these powers "with the assistance of Plaintiff" to fund Plaintiff's desired sale of Bollinger. Opinion at 6, PageID.450. Like many of the facts discussed above, Plaintiff's offer of assistance to the receiver went largely undisputed.[2] This Court

---

[2] As set forth in the accompanying Declaration, upon information and belief, others within Bollinger remained close to and aligned with Plaintiff. Indeed, Bollinger's primary witness, CEO Bryan Chambers, remarked he was relieved he did not have to work for Mullen after the receivership order was in place. Michery Decl. ¶ 26. And a Vice President of Human Resources stated, 'We won,' referring to

entered the Order Appointing Receiver ("Receivership Order") granting broad authority to the receiver, including the authority to sell some or all of the assets of Bollinger. ECF No. 29.

## VIII.  Control Is Stripped From Bollinger's Board.

After ceding his officer and director positions, Plaintiff, who is admittedly "assisting" the receiver, has effectively regained influence and control over Bollinger's future based on Bollinger's delay in making a $125,000 payment. Plaintiff has already taken advantage of that.

Mullen, as the majority shareholder, was not consulted on the terms of the receivership order. Michery Decl. ¶ 18. And Mullen had plans to consolidate the operations of Mullen and Bollinger, which would cut costs, increase efficiencies, and allow Bollinger to continue operating, which were not presented at the hearing. *Id.* ¶¶ 33-34. But, with the receivership in place, Mullen has now lost the ability to execute its plan or even access Bollinger's property, meaning all hope of salvaging Bollinger as a going concern is lost. Meanwhile, Plaintiff has been in Bollinger's offices on several occasions since the receiver's appointment, including attending a "town hall" to inform Bollinger's employees that Plaintiff would cover Bollinger's

---

appointment of the receiver. *Id.* ¶ 22. Thus, it is unsurprising that at the conclusion of the hearing, counsel for Bollinger did not directly contest that a receiver was warranted, instead stating that the issue presented a "tough question." *Id.* at 93:8-9, PageID.554.

payroll, while the receiver attempted to facilitate a sale of Bollinger (likely to a competitor whose purchase attempt Mullen had already rejected). *Id.* ¶¶ 23, 26.

Despite permitting Plaintiff to be on-site at Bollinger, Mullen was told it had "no valid basis for having agents onsite" and directed to "immediately cease . . . seeking access to" Company facilities, absent agreement of the receiver or a Court order. *See* Letter from Counsel to the receiver to Mullen Automotive, dated May 9, 2025, **Ex. C**; Michery Decl. ¶ 24. What's more, any means for Bollinger or any other party to appeal the receiver's appointment may have been restricted because Mullen is barred from directing "the actions of Bollinger or its employees," presumably including counsel, and the receiver has requested that the Senior Vice President of Legal Affairs for Bollinger step down because she is also employed in Mullen's business and legal affairs office. *Id.* This could interfere with Mullen's ability to prepare timely SEC filings due May 20, 2025, because it immediately terminated Mullen's access to Bollinger's "IT system and accounting information." *Id.*

## LEGAL STANDARDS

### I.   Motion for Reconsideration Standards

"The decision to grant or deny a motion for reconsideration of an interlocutory order falls within the discretion of the district court." *Hosn v. Fly Baghdad Airline*, No. 20-13442, 2021 U.S. Dist. LEXIS 185204, at *3 (E.D. Mich. Sept. 28, 2021). A party can move for reconsideration if, among other grounds, "[t]he court made a

mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and the law before the court at the time of its prior decision" or "[n]ew facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision." E.D. Mich. LCivR 7.1(h)(2)(A), (C).

## II.   Receivership Standards

"A receivership is an 'extraordinary remedy' that a court should employ with the 'utmost caution' and grant 'only in cases of clear necessity to protect plaintiff's interests in the property.'" *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (quoting 12 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2983 (3d ed. 2014)); *Motley v. Metro Man I*, 702 F. Supp. 3d 596, 612 (E.D. Mich. 2023) ("[A]ppointment of a receiver is an extreme remedy of last resort that should not be used when another, less drastic remedy exists."); *Plastic Omnium Auto Inergy Indus. v. MCC Dev., Inc.*, No. 21-cv-11141, 2023 U.S. Dist. LEXIS 152377 (E.D. Mich. Aug. 10, 2023) ("Appointment of a receiver is a 'harsh remedy which should only be resorted to in extreme cases,' and when less drastic means have failed or would be futile.").

Courts in this circuit "consider a number of factors in deciding whether to appoint a receiver[.]" *Evans Tempcon*, 630 F. App'x at 414. These include "whether the property at issue is in 'imminent danger of . . . being lost, concealed, injured,

diminished in value, or squandered,' whether the defendant engaged in fraudulent conduct, 'the inadequacy of available legal remedies,' the lack of less drastic equitable remedies, and the likelihood that the appointment will do more good than harm." *Id.*

## **ARGUMENT**

### **I.   New Facts Introduced by Mullen Warrant a Different Outcome.**

The primary basis for reconsideration is simple. Plaintiff's asserted need for a receiver—and, consequently, this Court's analysis of the receivership factors—hinged primarily on a single "undisputed fact": absent a receiver, Plaintiff could not be repaid because "Defendant cannot, and Mullen will not," "protect Plaintiff's claim." Opinion at 11, PageID.455; *see id.* at 13 ("Plaintiff's property will be lost without a receiver . . . Defendant's desperate situation of insolvency, along with Plaintiff's likelihood of success in this lawsuit, are determinative in the Court's decision to appoint a receiver."); *id.* ("Defendant offers . . . no alternative remedies that would make Plaintiff whole."). But this fact was only "undisputed" because Plaintiff's loyalists at Bollinger were not representing Mullen's interests at the hearing.

Critical to this finding was this Court's belief that Mullen was "prohibited from transferring funds to other entities" as the result of the *GEM* Litigation. Opinion at 5, PageID.449. This Court stated that the Southern District of New York's "order

makes it less likely that Mullen will be in a position to support Defendant with any additional funds." *Id.*; *see also id.* at 10 ("Plaintiff presented evidence that Mullen's ability to provide funding may be disappearing: Mullen is apparently now subject to a federal court judgment and restraining order from the Southern District of New York prohibiting Mullen from transferring funds elsewhere . . . Mullen is clearly having financial troubles of its own."). But since that finding, Mullen has "executed a settlement agreement with GEM Yield Bahamas Limited and GEM Global Yield LLC SCS" that, once final, will result in "complete satisfaction of the judgment." See NASDAQ, *Mullen Automotive Enters Settlement Agreement with GEM*, May 13, 2025, available at https://www.nasdaq.com/articles/mullen-automotive-enters-settlement-agreement-gem (last visited May 13, 2025). And GEM has agreed to lift the restraining orders, so Mullen is free to transfer funds to Bollinger as it sees fit. *See* GEM Yield Letter, **Ex. D;** Michery Decl. ¶ 9.

But for the receivership, Mullen intends to continue funding Bollinger, just as it has done since investing close to $150 million into Bollinger in 2022, and over $30 million in the last 10 months. Michery Decl. ¶¶ 4, 7, 13. And Mullen has already secured funding to pay Plaintiff the entire $10 million owed, provided the receivership does not interfere with Mullen's operations and certain other conditions are met . *Id.* ¶10.

Thus, while this Court found it "undisputed" that Mullen "will not" fund Bollinger or assist in paying Plaintiff, that finding was based on an asserted prohibition on transferring funds that no longer exists, and on a skewed presentation of Mullen's ability and willingness to make Plaintiff whole. Michery Decl. ¶¶ 9, 19. Once Plaintiff is made whole, he will have no basis to claim damages or pursue his breach of contract claim. And after payment moots the underlying claim, Plaintiff will have no basis to claim a receiver is needed for any reason – much less to protect Plaintiff's own assets. *See WB Music Corp. v. Royce Int'l Broad Corp.*, 47 F.4th 944, 952 (9th Cir. 2022) (citing general, but "not absolute," rule that "equity receiverships should be terminated as soon as the legitimate purposes of the receivership have been accomplished" and "[w]hen the reason for continuing the receivership has ceased, the property should be discharged and restored to the owner") (citations omitted).

Moreover, this Court's finding that "appointing a receiver will likely do more good than harm" was premised on the belief that Bollinger was unable to operate going forward. Indeed, this Court noted, "[s]ince Defendant can no longer operate as a viable company, more would be gained by giving a receiver a chance to marshal the assets, and explore potential options in an attempt to salvage the company." Opinion at 14, PageID.458. "If nothing can save the company, there is little loss in

its potential liquidation. And if the receiver is able to pay Defendant's creditors, that will have a good effect." *Id.*

But not only does Mullen intend to continue funding Bollinger, it also has viable plans to do so. Mullen is prepared to combine the operations of Mullen and Bollinger, and it has prepared a detailed budget and plans to do so. Michery Decl. ¶ 33. As Plaintiff knew (but did not present to this Court at the hearing), Mullen's plans include: (1) right-sizing the staff to eliminate redundancies across the two companies; (2) manufacturing Bollinger vehicles at Mullen's plant in Tunica, Mississippi, rather than through the far more expensive third-party manufacturer Bollinger uses; (3) ensuring that existing inventory is sold before additional manufacturing occurs; and (4) cross-selling Mullen and Bollinger's products. *Id.* ¶ 34.

Yet at nearly every turn, Bollinger slowed these plans. It inflated cost estimates for moving production, delayed implementation of downsizing, prevented Mullen from synthesizing HR and IT operations, refused Mullen's marketing efforts to cross-sell and information share, and squandered many viable sales leads provided by Mullen. Michery Decl. ¶¶ 35-37, 39. As yet another example, at a marketing conference held a month ago in the midst of Bollinger's financial troubles, Bollinger refused to consolidate marketing booths with Mullen, a move that would have saved the companies $40,000. *Id.* ¶ 38. Instead, Bollinger set up a separate booth, from

which it openly badmouthed Mullen and approached the rejected third-party suitor, Motiv, with vague statements like, "come back and talk to us in a few weeks" (presumably after the hearing at which the Court appointed the receiver). *Id.* ¶¶ 22, 38.

In short, the receiver—who was appointed without the benefit of all facts regarding Mullen's ability to continue to operate Bollinger as a going concern— strips Mullen of all rights and prevents its consolidation plan from being implemented. And, effectively, a single minority shareholder is seemingly in position to influence Bollinger's future. Given Mullen's near $180 million investment and plans and ability to continue Bollinger, for the benefit of both companies' shareholders, employees, and creditors, Mullen respectfully requests that the Court give it the benefit of its bargain and allow it the opportunity to continue to operate Bollinger.

## II.    This Court Should Reconsider Its Order Finding the Receivership Standards Met.

In this Circuit, a receivership should be employed "only in cases of clear necessity to protect plaintiff's interests in the property." *Evans Tempcon*, 630 F. App'x at 414. Based on the above facts Mullen introduces via this motion, "Plaintiff's interests in the property" are already protected. But even setting aside

these new facts, Mullen respectfully asserts that this Court should reconsider the receivership for additional reasons.

### A. There Are Less Drastic Measures Available That Will Protect Plaintiff's Property.

As courts have repeatedly recognized, a receivership is "an extreme remedy of last resort that should not be used when another, less drastic remedy exists." *Motley*, 702 F. Supp. 3d at 612; *Plastic Omnium*, 2023 U.S. Dist. LEXIS 152377, at *6 ("Appointment of a receiver is a 'harsh remedy which should only be resorted to in extreme cases,' and when less drastic means have failed or would be futile."). Here, "less drastic" remedies exist.

This Court was led to believe that "allowing Plaintiff to pursue this case to judgment would be inadequate to protect his interests" because, by "the time Plaintiff can secure a judgment, there may be no assets left and nothing against which to take a judgment." Opinion at 13, PageID.457. But, as shown through this Court's previously-issued Protective Order, it can fashion a remedy that prevents existing assets from being disbursed without Court approval. *See* Protective Order, ECF No. 27. And, given this Court's indications that this is a straightforward case with straightforward liability issues, it can issue a case management schedule that will result in an expedited path to judgment, while such a remedy remains in effect. *See* Opinion at 8-9, PageID.452-53.

Proceeding in this manner will preserve existing assets. And it will do so without stripping authority from a majority shareholder who has invested nearly $180 million, and who is as incentivized as anyone to see Bollinger succeed. If instead Bollinger is sold, that bell cannot be unrung.

### B.     There is No Evidence of Fraudulent Conduct.

This Court correctly recognized at the outset that Plaintiff has failed to present evidence of fraudulent conduct that will place his assets at risk. 3/31/25 Hr'g Tr. at 5:16-20 ("[Y]ou need to show fraud and you didn't do it in your briefing."). That remains true. And as other courts have found, "[m]ere speculation of fraud will not justify appointing a [receiver], particularly when that speculation is based on nothing more than the plaintiff's unsupported allegations." *See Hill v. Cohen*, 40 F.4th 101, 116 (3d Cir. 2022) (analyzing Pennsylvania law).

In short, each of the factors this Court evaluated when appointing the receiver warrant reconsideration. Although this Court found Plaintiff has a valid claim that is likely to succeed, Opinion at 8-9, Plaintiff will be unable to prove damages given Mullen's willingness to pay the entire $10 million principal balance of the loan. This Court has already determined that there is "less compelling" evidence of fraudulent conduct, *id.* at 9-11, and the "concerns" the Court had about Mullen's ability to pay and plans going forward are mitigated by Mullen's new evidence. This Court's findings that "Plaintiff's property will be lost without a receiver" and that "other

21

remedies are inadequate" to "protect his interests," *id.* at 12-13, are rebutted by Mullen's offer to pay Plaintiff's full amount of damages. And this Court's finding that "appointing a receiver will likely do more harm than good" is also misplaced in light of Mullen's evidence. The receiver's appointment prevents Mullen from exercising business judgment over Bollinger's affairs and will result in a sale of Bollinger over Mullen's objection. The Court should therefore grant Mullen's motion to reconsider.

## III.   At a Minimum, This Court Should Modify the Receivership Order

In the event this Court elects not to reconsider the appointment of a receiver, alternatively, it should still modify the Receivership Order, primarily to prevent the receiver from selling Bollinger. Again, the majority shareholder has viable plans to continue Bollinger's operations, which were not disclosed to this Court. Rather than rush to sell Bollinger at the recommendation of an ousted minority shareholder, and while Bollinger's existing assets are protected, this Court should allow Bollinger to continue to operate under its existing management structure. This Court should also make other changes to the Order to protect Mullen's rights as a shareholder, as set forth in Mullen's proposed revisions. (**Ex. A**.)

## IV.   This Court Should Stay the Receivership Order Pending an Evidentiary Hearing.

Finally, this Court should stay the Receivership Order and the receiver's authority while Mullen's motions are pending. Like analogous motions to stay a case

pending appeal, the appropriate framework for evaluating Mullen's request to stay the Order is "the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Those factors are:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*A. Philip Randolph Inst. v. Husted*, 907 F.3d 913, 918-19 (6th Cir. 2018). All four factors point towards granting a stay here:

*(1) Likelihood of success*: "To justify the granting of a stay . . . a movant need not aways establish a high probability of success on the merits." *A. Philip Randolph*, 907 F.3d at 919 (quotation marks omitted). Rather, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [the movant] will suffer absent the stay." *Id.* (quotation marks omitted). When the movant "demonstrates irreparable harm that decidedly outweighs any potential harm to the [parties] if a stay is granted," it need only show a "serious question going to the merits." *Id.* (quotation marks omitted). Here, as discussed above, there is *at least* a "serious question" about the appointment of a receiver.

*(2) Likelihood of irreparable harm absent a stay*: Without a stay, Mullen may suffer the irreparable harm of losing its majority stake in Bollinger. The receiver is

23

already working toward selling Bollinger to a competitor. Even before the hearing, the receiver and Plaintiff had discussed a plan for Plaintiff to fund Bollinger's payroll to put Bollinger in a better position to be sold "as a going concern." *See* 5/7/25 Hr'g Tr. at 81:22-84:9, ECF No. 34, PageID.542-45. And that is exactly what Plaintiff and the receiver told Bollinger employees they were going to do when they visited Bollinger's office together. Michery Decl. ¶¶ 23, 25. Now that this Court has entered the Receivership Order, the receiver is free to enter into that sale at any time without the approval of Mullen or Bollinger's Board. *See* ECF No. 29, Receivership Order, at PageID.429. If that happens, Mullen will lose its entire majority share in Bollinger. That loss could not be remedied with money damages after-the-fact because it would be difficult to predict how profitable Bollinger might eventually become under Mullen's continued control in the quickly evolving electric vehicle market. *See Southern Glazer's Distribs. of Ohio LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017) ("An injury is irreparable if it is not fully compensable by monetary damages, that is, the nature of the plaintiff's loss would make damages difficult to calculate.") (cleaned up).

*(3) Harm to others from granting a stay*: A temporary stay pending reconsideration will not harm Plaintiff because his alleged basis for needing the receivership is his purported fear that Bollinger cannot pay back his $10 million loan—*but Mullen is able and willing to pay Plaintiff the entire $10 million*. Michery

24

Decl. ¶ 10. At base, Plaintiff does not need a receiver to ensure he is made whole. Further, even setting aside Mullen, the Court's Protective Order would still be in place to ensure that Plaintiff's collateral is not sold or dissipated.[3] ECF No. 27 at 2, PageID.415. And Plaintiff would remain a secured creditor. Those factors reinforce that temporarily staying the Receivership Order would not harm Plaintiff.

*(4) The public interest*: The public interest favors granting a stay because public policy should protect shareholders' rights and discourage the sales of companies over their shareholders' objections via receiverships.

## <u>CONCLUSION</u>

For the reasons explained above, this Court should grant Mullen's motion for reconsideration, and deny Plaintiff's renewed motion for receiver or, in the alternative, schedule an evidentiary hearing to consider new facts that may warrant a different outcome. Alternatively, this Court should modify and limit the scope of the receivership to prevent a sale of Bollinger. And, in the meantime, this Court should stay the Receivership Order while it considers Mullen's motions.

DYKEMA GOSSETT PLLC

Dated: May 20, 2025           By: *s/ Jennifer L. Beidel*
                                      Jennifer L. Beidel (P86645)

126901.000001  4924-8978-0033.15

---

[3] Although some of the collateral has recently been released via stipulated order, *see* ECF No. 33, the Court can always order Bollinger to return this collateral to escrow under the Protective Order.

# EXHIBIT A
## to
## Proposed Motion for Reconsideration

(Proposed Revised Appointment Order)

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ROBERT BOLLINGER,

          Plaintiff,

v

BOLLINGER MOTORS, INC.,

          Defendant.

_____/

Case No. 2:25-CV-10790
Hon. Terrence Berg
Mag. Judge Anthony P. Patti

## ORDER APPOINTING RECEIVER

**THIS MATTER** having come before the Court upon Plaintiff Robert Bollinger's Emergency Motion to Appoint Receiver, brought pursuant to Rule 66 of the Federal Rules of Civil Procedure, for the assets, business, and operations of Defendant Bollinger Motors, Inc. ("Bollinger Motors") in the above-captioned action; the Court finding that, based on the record in these proceedings, good cause exists for the appointment of a receiver pursuant to the terms of the Note between the parties and applicable federal law that the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all the assets of Bollinger Motors, (the "Receivership Assets"); the Court finding that it has subject matter jurisdiction over this action and personal jurisdiction over Bollinger

1

Motors, and venue properly lies in this district; the Court being otherwise duly advised in the premises:

**IT IS ORDERED** as follows:

1.     The Court takes exclusive jurisdiction and possession of the Receivership Assets of whatever kind and wherever situated, of or under the control of Bollinger Motors.

2.     Until further Order of this Court, Gene Kohut is hereby appointed to serve without bond as receiver (the "Receiver") for the estate of Bollinger Motors. The Receiver is appointed for the purpose of managing, protecting, preserving, <u>and</u> operating~~, and selling some or~~ all of the Receivership Assets for the benefit and protection of Robert Bollinger, Bollinger Motors, and Bollinger Motors' other creditors and stakeholders, and the Receiver is hereby granted and vested the powers identified in this Order or subsequent Orders of this Court including all powers reasonably incidental thereto. The Receiver's responsibilities include oversight of all aspects of the management, assets, and operation of Bollinger Motors' business, ~~as well as the decision on whether to sell Bollinger Motors as a going concern, or to sell any or all of the Receivership Assets~~ and the Receiver shall fulfill his obligations in good faith and in accordance with applicable law. For the avoidance of doubt, this receivership is over Bollinger Motors as a business entity, the Receivership Assets, and any assets in which Bollinger Motors has an interest.

2

**Asset Freeze**

3.      Except as otherwise specified herein, all Receivership Assets are frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets that are on deposit with financial institutions such as banks, brokerage firms, and mutual funds.

**General Powers and Duties of Receiver**

4.      The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, and managers, and stockholders of Bollinger Motors under applicable state and federal law, by the bylaws, articles, and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of Rule 66 of the Federal Rules of Civil Procedure and applicable federal statute.

5.      The powers of any directors, officers, managers, employees, investment advisors, accountants, attorneys, shareholders and other agents of Bollinger Motors are hereby suspended. Such persons and entities shall have no authority with respect to Bollinger Motors' operations or assets, except to the extent as may hereafter be

3

expressly granted by the Receiver. The Receiver shall assume exclusive control of the operation of Bollinger Motors and shall pursue and preserve all of its claims.

6.     No person holding or claiming any position of any sort with Bollinger Motors shall possess any authority to act by or on behalf of Bollinger Motors, except to the extent as may hereafter be expressly granted by the Receiver.

7.     Receiver does not have the authority at this time to sell all or substantially all of the Receivership Assets or to sell Bollinger Motors as a going concern.

7.8.   Subject to the specific provisions of this Order, the Receiver shall have the following general powers and duties:

A.     To use reasonable efforts to determine the nature, location, and value of all property interests of Bollinger Motors, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which Bollinger Motors owns, possesses, has a beneficial interest in, or controls directly or indirectly;

B.     To take custody, control, and possession of all Receivership Assets and records relevant thereto from Bollinger Motors; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Assets and records relevant thereto;

C.     To manage, control, operate, and maintain the Receivership Assets, including the right to operate its business subject to a budget to be agreed upon by the Receiver, and Robert Bollinger, and any intervening parties in this case (the "Budget") and shared with counsel for Defendant, and hold in his possession, custody, and control all Receivership Assets pending further Order of this Court;

4

D.      To use Receivership Assets for the purpose of making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.      To take any action which, prior to the entry of this Order, could have been taken by the ~~stockholders,~~ officers, directors, partners, managers, trustees, and agents of Bollinger Motors;

F.      To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G.      To take such action as necessary and appropriate for the preservation of the Receivership Assets or to prevent the dissipation or concealment of the Receivership Assets;

H.      To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.      To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.      To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against Bollinger Motors;

K.      To transfer, compromise, sell, or otherwise dispose of any Receivership Asset, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to Bollinger Motors, with due regard to the realization of the true and proper value of such Receivership Asset and consistent with governing law <u>and subject to the limitation on the Receiver's authority in Paragraph 7</u>;

L.      To borrow funds secured by the Receivership Assets, subject to the consent of any secured creditor with a lien on the assets being pledged;

M.      ~~To sell all or substantially all of the Receivership Assets, including via credit bid, subject to approval by the Court;~~

5

N.M.  To take such other action as may be approved by this Court.

## Access to Information

8.9.   Bollinger Motors and its past or present officers, directors, agents, managers, stockholders, trustees, attorneys, accountants, and employees, as well as those acting in their place, are ordered and directed to preserve and turn over to the Receiver immediately all paper and electronic information of, and/or relating to, Bollinger Motors and/or all Receivership Assets; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

9.10.  Bollinger Motors and its past or present officers, directors, agents, managers, stockholders, trustees, attorneys, accountants, and employees, as well as those acting in their place, and all other appropriate persons or entities shall answer to the Receiver all questions reasonably related to the receivership or Receivership Assets which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of Bollinger Motors, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to Bollinger Motors. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests, which shall be answered under oath in accordance with the Federal Rules of Civil Procedure.

## **Access to Books, Records, and Accounts**

~~10.~~11. The Receiver is authorized to take immediate possession of all assets, bank accounts, or other financial accounts, books, and records, and all other documents or instruments relating to Bollinger Motors. All persons and entities having control, custody, or possession of any Receivership Assets are hereby directed to turn such property over to the Receiver.

~~11.~~12. Bollinger Motors, as well as its agents, servants, officers, directors, employees, attorneys, any persons acting on its behalf, and any persons receiving notice of this Order by personal service, electronic mail, or otherwise, having possession of the property, business, books, records, accounts, or assets of Bollinger Motors are hereby directed to deliver the same to the Receiver, his agents and/or employees.

~~12.~~13. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of Bollinger Motors that receive actual notice of this Order by personal service, email transmission, or otherwise shall:

    A.    Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of Bollinger Motors except upon instructions or prior written approval from the Receiver;

B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.    Within five (5) business days of receipt of this Order, file with the Court and serve on the Receiver a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of this Order; and

D.    Cooperate expeditiously and in good faith in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

### Access to Real and Personal Property

13.14. The Receiver is authorized to take immediate possession of all personal property of Bollinger Motors, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media, or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

14.15. The Receiver is authorized to take immediate possession of all  real property of Bollinger Motors, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, e-mail transmission, or otherwise, all persons other than law enforcement officials acting within the scope of their official duties are (without

the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing, or erasing anything on such premises.

15.16. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to any premises leased or used by Bollinger Motors in connection with its business. The Receiver shall have exclusive control of the keys. Bollinger Motors, or any person acting or purporting to act on its behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership, except to the extent as may hereafter be expressly granted by the Receiver.

16.17. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of Bollinger Motors, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

**<u>Notice to Third Parties</u>**

17.18. The Receiver shall promptly give notice of his appointment to– all known officers, directors, agents, employees, stockholders, creditors, debtors, and managers of Bollinger Motors, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

18.19. All persons and entities owning any obligation, debt, or distribution with respect to Bollinger Motors shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its his receipt for of such payments shall have the same force and effect as if Bollinger Motors had received such payment.

19.20. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of Bollinger Motors in order to effectuate the terms of this Order.

20.21. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of Bollinger Motors.

## Stay of Actions

21.22. Except by leave of the Court, during pendency of the receivership ordered herein, all other persons and entities aside from the Receiver are hereby stayed from taking any action to establish or enforce any claim, right, or interest against Bollinger Motors or against the Receivership Assets, including, but not limited to, the following actions:

A.  Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding;

10

B.   Accelerating the due date of any obligation or claimed Bollinger Motors obligations (or any of them); filing or enforcing any lien; taking or attempting to take possession, custody or control of any Receivership Asset and/or attempting to foreclose, forfeit, alter or terminate any interest in any Receivership Asset, whether such acts are part of a judicial proceeding or are acts of self-help or otherwise;

C.   Executing, issuing, serving, or causing the execution, issuance or service of, any legal process against Bollinger Motors, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this Stipulated Order or not; and

D.   Doing any act or thing whatsoever to interfere with the Receiver taking custody, control, possession, or management of any Receivership Asset or document, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of the Court over the Receivership.

## **Injunction Against Interference with Receiver**

22.23. Bollinger Motors and all persons receiving notice of this Order by personal service, electronic mail or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.   Interfere with the Receiver's efforts to take control, possession, or management of any of the Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

B.   Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying, or altering records or information;

11

C.   Dissipate or otherwise diminish the value of any of the Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Assets, enforcing judgments, assessments or claims against the Receivership A~~a~~ssets, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate the due date, of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by Bollinger Motors or which affects any Receivership Assets; or

D.   Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over Bollinger Motors.

~~23.~~24. Bollinger Motors shall cooperate with and assist the Receiver in the performance of his duties. The Receiver shall promptly notify the Court of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

~~24.~~25. The Receiver and his agents, acting within the scope of such agency, are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver nor his agents be liable to anyone for their good faith compliance with their duties and responsibilities.

~~25.~~26. This Court shall retain jurisdiction over any action filed against the Receiver or his agents based upon acts or omissions committed in their representative capacities.

## **Recommendations and Reports**

26.27. The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Assets. Within thirty (30) days of the entry date of this Order, the Receiver shall file a status report with the Court which shall include a summary of receivership activities to date and a proposed plan for administering the receivership going forward, including a proposed deadline by which the Receiver will submit a liquidation plan.

## **Fees, Expenses, and Accountings**

27.28. The Receiver need not obtain Court approval prior to the disbursement of funds for expenses in the ordinary course of the administration and operation of the receivership. Further, Court approval is not required for payments of applicable federal, state, or local taxes.

28.29. The Receiver is authorized to solicit persons and entities to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any such persons or entities without first obtaining an Order of the Court authorizing such engagement.

29.30. The Receiver is entitled to reasonable compensation and expense reimbursement from the Receivership Assets. Such compensation shall require the prior approval of the Court, such approval of which shall be sought within twenty

13

(20) days after the end of each calendar month. The Receiver's reasonable and necessary fees and expenses, including Receiver's attorneys', accountants', and other professionals' fees, shall be paid out of the Receivership Assets, or if the Defendants' Assets are not sufficient to pay such amounts, then Plaintiff shall pay them, subject to the Budget, conditioned upon Robert Bollinger's right in the event of any dispute to request the Court's determination of the amount to be paid.

30.31. At the close of the Receivership, the Receiver shall submit a final accounting, as well as the Receiver's final application for compensation and expense reimbursement.

31.32. Nothing in this Order shall restrict or limit the rights of Bollinger Motors's shareholders to bring or assert claims against Plaintiff.

**SO ORDERED.**

14

# EXHIBIT B

to
Proposed Motion for
Reconsideration

(Declaration/Affidavit of David Michery)

***Refer to Exhibit 3***

# EXHIBIT C

to
Proposed Motion for
Reconsideration

(Letter from Receiver's Counsel to Jillian Green, May 9, 2025)



McDonald Hopkins PLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI 48304
P 1.248.646.5070
F 1.248.646.5075

Stephen M. Gross
Direct Dial: 248-220-1337
Email: sgross@mcdonaldhopkins.com

May 9, 2025

**VIA ELECTRONIC MAIL:** JGreen@mullenusa.com.

Jillian Green
Sr. Vice-President-Business & Legal Affairs
Mullen Automotive
1405 Pioneer Street
Brea, CA 92821

**Re:    Bollinger Motors, Inc.**

Dear Ms. Green:

As I believe you are aware, on May 7, 2025, the attached Order Appointing Receiver (the "Order") was entered in the United States District Court for the Eastern District of Michigan in Case No. 2:25-CV-10790 appointing Gene Kohut as the Receiver (the "Receiver") with exclusive authority over the assets and business of Bollinger Motors, Inc. ("Bollinger").  Please be advised that I am legal counsel to the Receiver and am writing to you in your capacity as legal counsel to Mullens Automotive ("Mullens").

It has been brought to the Receiver's attention that employees, agents and/or representatives of Mullens have been requesting access to Bollinger's facilities apparently to "observe".  However, pursuant to paragraphs 5 and 6 of the Order, the power and authority of the directors, officers, and managers of Bollinger have been suspended.  As such, Mullens, as well as its representative on Bollinger's board, have no authority to direct the actions of Bollinger or its employees, and no valid basis for having agents onsite.

Additionally, under paragraphs 21.D. and 22.B. and D. of the Order, all persons are prohibited and enjoined from taking any actions obstruct, harass or interfere with the receiver taking custody of the assets or managing the operations of Bollinger.  As such, this will serve as the Receiver's formal demand that Mullens and its agents immediately cease interfering with the Receiver by seeking access to Bollinger's facilities, absent an agreement with my client or an Order from the Court.

Additionally, the Receiver has learned that Mullens' employees have access to certain portions of Bollinger's IT system and accounting information.  This will serve as notice that Mullens' access to

36163918.1

Jillian Green
Sr. Vice-President-Business & Legal Affairs
Mullen Automotive
May 9, 2025
Page 2

Bollinger's IT system and accounting information, except what it is entitled to as a shareholder, is immediately being terminated.

Finally, it has come to my attention that you are currently also serving as Senior Vice President of Legal Affairs for Bollinger.  Candidly my client views this as a clear conflict of interest and respectfully requests that you resign your position at Bollinger.

Please do not hesitate to contact me if you wish to discuss the foregoing.

Very truly yours,

Stephen M. Gross

SMG/sh

36163918.1

# EXHIBIT D

to
Proposed Motion for
Reconsideration

(GEM Yield Letter)

# EVERSHEDS SUTHERLAND

**Eversheds Sutherland (US) LLP**
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, NY 10036-7703

D: 212.389.5083
F: 212.389.5099

franknolan@eversheds-sutherland.com

May 13, 2025

**Via Email**
David K. Momborquette
Antonios G. Koulotouros
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017
dmomborquette@mwe.com
akoulotouros@mwe.com

Re:     *GEM Yield Bahamas Limited, et al. v. Mullen Technologies, Inc., et al.* **Case No. 1:24-cv-01120-KPF – Letter Withdrawing Restraining Notices**

Counsel:

On behalf of GEM Yield Bahamas Limited and GEM Global Yield LLC SCS (together, "GEM"), I am writing to inform you that GEM withdraws the restraining notices (the "Notices") issued on April 25, 2025, to Mullen Technologies, Inc. and Mullen Automotive, Inc. (together, "Mullen") in the above referenced matter.  GEM's withdrawal of the Notices is made in accordance with Paragraph 9 of the Settlement Agreement and Release between GEM and Mullen, dated May 8, 2025 ("Settlement Agreement").

GEM reserves all rights including the right to reissue the Notices and/or other restraining notices to the full extent allowed under New York and federal law if the Settlement Agreement is terminated and/or if the settlement is not effectuated.

Let us know if there are any questions.

Sincerely,

**Francis X. Nolan**
EVERSHEDS SUTHERLAND (US) LLP

FXN:zwl

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ROBERT BOLLINGER,**

*Plaintiff*,

v.

**BOLLINGER MOTORS, INC.,**

*Defendant*.

Case No. 2:25-cv-10790-TGB-APP

Hon. Terrence G. Berg

Hon. Mag. Anthony P. Patti

## PROPOSED INTERVENOR MULLEN AUTOMOTIVE, INC.'S [PROPOSED] ORDER GRANTING EMERGENCY MOTION TO INTERVENE

Upon consideration of Mullen Automotive, Inc.'s ("Mullen") Emergency Motion to Intervene, it is hereby ORDERED as follows:

Mullen's Motion to Intervene is granted and Mullen is permitted to intervene in this matter in order to oppose Plaintiff's Count II for Appointment of Receiver;

Within 3 days, Mullen shall file the proposed Emergency Motion for Reconsideration attached to its Emergency Motion to Intervene as Ex. 1.A; and,

The parties are ordered to file a response, if any, to the Emergency Motion for Reconsideration within 7 days of the date that Mullen files it.

**IT IS SO ORDERED.**

DATED: May ___, 2025

_____
Hon. Terrence G. Berg

4908-4512-9284.3

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **ROBERT BOLLINGER,** | Case No. 2:25-cv-10790-TGB-APP |
| *Plaintiff*, | Hon. Terrence G. Berg |
| v. | |
| **BOLLINGER MOTORS, INC.,** | |
| *Defendant*. | |

**DECLARATION OF DAVID MICHERY IN SUPPORT OF PROPOSED
INTERVENOR MULLEN AUTOMOTIVE, INC.'S MOTION FOR
<u>RECONSIDERATION OF RECEIVERSHIP ORDER</u>**

I, David Michery, being first duly sworn, on oath state as follows:

1. I am over the age of eighteen and under no legal disability that would prevent me from providing evidence regarding the matters contained within this Declaration.

2. This Declaration is made based upon my personal knowledge of the facts, my conversations with witnesses, and review of certain records that are kept and maintained in the ordinary and regular course of business.

3. I am the CEO of Mullen Automotive, Inc. ("Mullen") and Chairman of the Board of Directors, and Chairman of the Board of Directors Bollinger Motors, Inc. ("Bollinger"). Mullen makes two classes of electric trucks and

Bollinger makes one different class of electric trucks, so the businesses have many synergies.

4.      Mullen acquired a 60% controlling interest in Bollinger in September 2022, via a $148.2 million investment.

5.      Mullen is currently the approximately 73% controlling shareholder in Bollinger because of subsequent investment of approximately $30 million from July 2024 to present.

## I.      Mullen's Current Financial Situation

6.      Mullen's financial status was not represented accurately at the hearing on Plaintiff Robert Bollinger's motion to appoint a receiver held on May 7, 2025.

7.      First, Mullen has a third-party investor (the "Investor") who has committed to fund both Mullen and Defendant Bollinger Motors, Inc. ("Bollinger") at a rate of $1.5 million per week and whose total investment in Mullen exceeds $800 million to date over the past 9 years. *See* Ex. A, Email from Chester Bragado (Mullen CAO), dated April 24, 2025 ("On a positive note, David has secured a $1.5M per week funding commitment and is in discussions with another investor to potentially match that. There's real momentum building."). Mullen is also in discussions with a second investor regarding matching the weekly investment of $1.5 million per week. *Id.*

8. <u>Second</u>, despite the market pressures on the electric vehicle industry, Mullen achieved its strongest quarter results to date in December 2024, with $4.4 million invoiced and $6 million received on delivered vehicles. *See* SEC Filing Exhibit 99.1, Mullen Reports Financial Results for the Three Months Ended December 31, 2024, *available at* https://www.sec.gov/Archives/edgar/data/ 1499961/000182912625001104/mullenautomotive_ex99-1.htm (last visited May 15, 2025).

9. <u>Third</u>, there has been a material change in the litigation between Mullen and GEM Yield Bahamas Limited and GEM Global Yield LLC SCS ("GEM") in the Southern District of New York, *GEM Yield Bahamas Limited, et al. v. Mullen Automotive, Inc., et al.,* No. 1-24-cv-00120-KPF. Mullen and GEM executed a settlement agreement on May 8, 2025 for a full release of all claims against Mullen and its shareholders, pursuant to which Mullen agreed to give GEM title to an unused manufacturing plant in Indiana and related equipment that is inessential to Mullen's and Bollinger's businesses because Mullen has a second fully operational manufacturing facility in Mississippi where it produces its Class One and Class Three electric vehicles. *See* Mullen Form 8-K, filed May 9, 2025, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001499961/ 000182912625003598/mullenautomotive_8k.htm (last visited May 16, 2025). While GEM has a due diligence period in which it can decide whether to take title

to the manufacturing plant, on May 13, 2025, GEM agreed to withdraw the restraining notices issued to Mullen and referenced in this Court's findings. *See* Ex. B, Letter from GEM to Mullen, dated May 13, 2025. In other words, the GEM settlement does not change Mullen's cash position and does not prevent Mullen from funding Bollinger.

10.    <u>Fourth</u>, the Investor has committed to me that, he will fund Mullen with $10 million to provide to Plaintiff in resolution of his claims, provided Mullen's upcoming 10Q is timely filed (meaning Bollinger and the receivership do not interfere with that filing),  Mullen remains listed on NASDAQ and registered with the SEC, and Plaintiff is willing to meet certain other settlement conditions.

11.    <u>Fifth</u>, Mullen has filed notice with the SEC of a stockholder's meeting to be held on May 21, 2025, to approve a reverse stock split, which could further improve Mullen's stock price and allow Mullen's continued listing on NASDAQ. *See* Mullen Schedule 14A, dated May 9, 2025, available at https://www.sec.gov/ Archives/edgar/data/1499961/000182912625003526/mullenautomotive_def14a.htm (last visited May 16, 2025).

## II.    <u>Mullen's Relationship with Bollinger</u>

12.    Mullen has treated Robert Bollinger ("Plaintiff") and Bollinger more than fairly during the course of dealing between the two companies. In fact, Mullen has put Bollinger ahead of its own business on numerous occasions.

13.     Until appointment of the receiver, Mullen has invested more than $178 million into Bollinger. Most recently, Mullen has been paying Bollinger on a weekly basis. That funding has been used for Bollinger payroll, benefits, operating expenses, payments to Bollinger's contract manufacturer, and payments on Plaintiff's note. Mullen never represented to Bollinger, Plaintiff, or any other person that Mullen could not or would not continue to fund Bollinger.

14.     Much of the funding provided to Bollinger has come, and will continue to come, from the Investor, but the Investor is only willing to fund Bollinger if those funds flow through Mullen. In fact, Plaintiff called the Investor prior to the initiation of this lawsuit. He asked for the Investor to pay Bollinger directly, using false claims of vehicle sales to entice the Investor, but the Investor refused. In other words, Mullen's involvement is critical to Bollinger's ability to cashflow its operations.

15.     The payment giving rise to this litigation was the only late payment on the loan between Plaintiff and Bollinger. All payments have been made timely with the exception of the one late payment, which was just a few days late.

16.     While Plaintiff suggested Bollinger was intentionally selling off his collateral for the $10 million loan, Bollinger remedied that concern by placing the proceeds of the vehicles in trust for the benefit of Plaintiff. All proceeds from any vehicle sold by Bollinger, have always gone directly to Bollinger, and Bollinger

has always maintained sole discretion to disburse the proceeds as it saw fit. Mullen has never had access to Bollinger's sales proceeds nor did it ever request such access.

### III.   Mullen's Interests Have Not Been Represented in the Present Litigation

17.     Until the hearing that led to the appointment of the receiver, Mullen had no reason to believe Bollinger would not adequately represent Mullen's interests as majority shareholder in the litigation before this Court.

18.     Since Bollinger's counsel did not solicit my views on the terms of the receivership order, I was unaware of the degree of control Plaintiff would exercise over the receivership or of the receiver's rights to sell off the assets of Bollinger or the entire company itself without Court approval.

19.     At the hearing, the testimony of certain key Bollinger officials, and some of the statements of Bollinger's counsel, suggested an anti-Mullen bias. For example, Bryan Chambers, the Bollinger CEO, testified that he had repeatedly asked me to schedule a board meeting, without mentioning that any three board members could schedule one. And he testified about the state of Bollinger without fleshing out the financial recovery plan Mullen had proposed or the efforts Bollinger undertook to prevent its implementation. In fact, Chambers suggested no recovery plan was strategized, when Mullen had formulated detailed plans for a combination of the two companies that Bollinger had thwarted.

20.     Since the hearing, I have learned that certain key Bollinger insiders were aware that Plaintiff intended to sue Bollinger before the suit was filed and were aligned with Plaintiff's strategy. For example, Marianne McInerney, Mullen's Chief Strategy Officer, learned that the day before Plaintiff filed his Complaint in this matter, Jim Connelly, Bollinger's Chief Revenue Officer, sent a note to his sales team stating that "something big was happening" about which he wanted to brief the team. Connelly later directed the sales staff to stop selling until after a receivership order was entered. None of these facts were presented at the hearing.

21.     Once I learned of these developments, I directed Mullen representatives to investigate. As part of that investigation, I learned that from John Taylor, President of Mullen's Commercial Electric Vehicle Division, that Chambers suggested on March 19, 2025 that the best case for Bollinger was if Mullen went bankrupt so Bollinger could have a clean break from Mullen.

22.     McInerney conveyed to me similar sentiments expressed by others at Bollinger. At an industry event in April 2025, Chambers told Motiv—a firm whose prior offer to buy Bollinger had been refused by Mullen—to wait until after the day of the receivership hearing to call him (presumably because Chambers was hoping a receiver would be appointed and Motiv could purchase the company). And when the Court appointed the receiver, Helen Watson, Bollinger's Vice President of Human Resources, reportedly remarked to another Bollinger officer, "We won."

7

23.     The events that have occurred since the receivership order was entered show Plaintiff's undue influence to the exclusion of other shareholders. Chambers told Taylor that the day the receiver first came to Bollinger's offices, Plaintiff and Plaintiff's counsel accompanied the receiver to a "town hall" meeting called by Chambers with Bollinger staff. No one from Mullen was invited to the meeting nor were any Mullen employees informed of the meeting. In the meeting, Chambers said Plaintiff had promised he would cover Bollinger payroll.

24.     On May 9, 2025, the receiver instructed Mullen employees that they had no valid basis for being onsite at Bollinger. Thereafter, certain of those Mullen staff told the receiver that Plaintiff should also be barred from Bollinger. The receiver then directed Plaintiff not to return, but Plaintiff persisted in coming into Bollinger's offices. Ex. C, Letter from receiver's counsel to Jillian Green, dated May 9, 2025.

25.     Bollinger's sales difficulties disappeared immediately after the receiver was appointed. The day after the appointment, Chambers told Taylor that Bollinger's business was "picking up" and Bollinger was "starting to sell trucks" after a "sudden interest in their products." Chambers offered no explanation why a receivership would spark an interest in a company's products.

26.     Chambers also told Taylor that the receiver's stated goal was to sell Bollinger in its entirety, presumably to Motiv (the company that Mullen had

8

previously rejected and that Chambers told a month prior to wait until after the receivership to call him). Chambers also remarked that he was relieved that he did not work for Mullen anymore.

## IV.    **The Receivership Threatens Mullen's Interests**

27.    Mullen is a publicly traded company with obligations to prepare SEC filings, including a 10Q, which was due to be filed on May 14, 2025. Due to Bollinger's refusal to share necessary information with Mullen – potentially exposing Mullen to a violation of the SEC Act of 1934 – Mullen was forced to file an extension to May 20, 2025 to file its 10Q. *See* Ex. A (discussing my "repeated[] request[s]" to access Bollinger's IT systems.). The receivership could further delay Mullen's public filings if Bollinger denies Mullen's requests for information necessary to prepare the filings on the grounds that the receivership prohibits the sharing of this information. Ex. C ("This will serve as notice that Mullens' access to Bollinger's IT system and accounting information, except what it entitled to as a shareholder, is immediately being terminated."). It will be detrimental to Mullen if Mullen is unable to make timely SEC filings. Specifically, it may be delisted from NASDAQ and unable to continue to raise capital.

## V.   <u>Mullen's Management of Bollinger</u>

28.     Bollinger's board of directors (the "Board") has five directors. I am the Chairman of the Board. There is one other director selected by Mullen, two selected by Bollinger, and one independent director.

29.     Under the Bollinger bylaws, dated September 7, 2022, there was to be an annual meeting, and there was no schedule for regular board meetings. Instead, any three directors could call a Board meeting. In other words, the two Bollinger directors and the one independent director could have called a Board meeting at any time. Ex. D, Bollinger bylaws, dated September 7, 2022, at 6 (requiring a board meeting on the "written request of at least three (3) of the directors").

30.     The Board received information about Bollinger's operations through weekly reports Bollinger sent to all Board members, among others. These reports updated the Board members on a variety of topics, including Bollinger's finances, sales, business leads, engineering, manufacturing, marketing, and upcoming events. Bollinger also provided the directors with quarterly financial reports.

31.     Mullen also held company-wide Zoom meetings on Mondays. Those meetings included Bollinger's officers and directors.

32.     These reports and meetings kept Board members apprised of Bollinger's operations and afforded any group of three Board members (including

the two Bollinger directors and the independent director) the opportunity to call a Board meeting at any time.

## VII.   Mullen's Plans for Bollinger

33.   Mullen attempted to execute a plan to restructure Bollinger to make it profitable, but Bollinger and Plaintiff presented roadblocks at every turn and failed to share that conduct with the Court at the hearing.

34.   Mullen's plan included: (1) right-sizing the staff to eliminate redundancies across the two companies; (2) manufacturing Bollinger vehicles at Mullen's plant in Tunica, Mississippi – where Mullen's Class One and Class Three electric vehicles are currently in production, rather than through the far more expensive third-party manufacturer Bollinger uses; (3) ensuring that existing inventory is sold before additional manufacturing occurs; and (4) cross-selling Mullen and Bollinger's products.

35.   These consolidation measures would have gone a long way toward making Bollinger viable. For example, Bollinger currently pays its third-party manufacturer approximately $250,000 each month, even when Bollinger is not manufacturing any vehicles. Currently, Bollinger has an inventory of 40 trucks— each with an approximately $150,000 retail value, for a total of $6 million in value. Bollinger does not need to manufacture until those trucks are sold, but has been incurring debts to the third-party manufacturer at a rate of $250,000 a month in the

meantime. And yet Bollinger staunchly opposed moving the manufacturing to Mullen's plant, producing a cost estimate for the move that was four times that of Mullen's consultants.

36.     By way of further example, Bollinger delayed implementation of cost-cutting measures to reduce duplicative positions across Mullen and Bollinger that were identified after a December 2024 budget review, even as Mullen itself cut approximately $1.5 million in payroll.

37.     Even the administrative departments at Bollinger refused to cooperate, putting up roadblocks to Mullen's access to HR and IT records.

38.     Bollinger staff also refused to consolidate marketing operations or to cross-sell or information share with Mullen's sales team. Just last month, Bollinger employees refused to share a $40,000 booth with Mullen at a trade show and then made comments undercutting Mullen and its products.

39.     Bollinger also regularly refused sales leads obtained by Mullen. For example, McInerney reported that Bollinger management flatly stated that it was not interested in making a deal with a reputable dealer in an area where Bollinger lacked a presence, despite the dealer being a good match for Bollinger and already a partner of Mullen. Another potential buyer was told by Bollinger, without explanation, that Bollinger could not sell it vehicles. This occurred even though Bollinger had earlier claimed to have sold 80 vehicles to that buyer, when the

buyer, in fact, considered that sale an allocation. In another instance, Bollinger staff inexplicably waited four weeks to get a price quote for the potential sale of ten vehicles to a buyer provided by Mullen, and the deal fell through because of the delay. In still another situation, Bollinger inexplicably failed to upfit Bollinger trucks to sell to cellphone carriers in the time promised.

40.    If the receivership order is suspended, Mullen will return to its efforts to execute these consolidation plans.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  May 20, 2025

_____
DAVID MICHERY

# EXHIBIT A
## to
# Declaration of David Michery

(Email from Chester Bragado, April 24, 2025)

**Villajuan, Emily**

| | |
|---|---|
| **From:** | Jillian Green <JGreen@mullenusa.com> |
| **Sent:** | Tuesday, May 13, 2025 1:41 PM |
| **To:** | Peter Prisbrey; David Michery; Makayla Brown; Jonathan New; Sandra Boyer; Chester Bragado |
| **Subject:** | Re: Subject: Coordination for Immediate 200k Funding and Next Steps - FW: Mullen IT Administrative Access |

Thank you, Peter.

That is in line with the receiver's instructions to Bollinger.



**Jillian N. Green**
SVP-Business & Legal Affairs


559 797 6831

1405 Pioneer Street
Brea, CA 92821

mullenusa.com

**From:** Peter Prisbrey <PPrisbrey@mullenusa.com>
**Date:** Tuesday, May 13, 2025 at 8:57 AM
**To:** David Michery <david@mullenusa.com>, Makayla Brown <mbrown@mullenusa.com>, Jonathan New <Jnew@mullenusa.com>, Sandra Boyer <SBoyer@mullenusa.com>, Jillian Green <JGreen@mullenusa.com>, Chester Bragado <CBragado@mullenusa.com>
**Subject:** RE: Subject: Coordination for Immediate 200k Funding and Next Steps - FW: Mullen IT Administrative Access

Hello,
Bollinger has blocked my ability to access the Bollinger Motors Microsoft 365 environment.
-Peter





**Peter Prisbrey**
VP of IT

657-246-3202
1405 Pioneer Street
Brea, CA 92821

mullenusa.com



**From:** Bryan Chambers <bryan@bollingermotors.com>
**Sent:** Tuesday, April 29, 2025 10:23 AM
**To:** Shane Monson <smonson@BollingerMotors.com>; Chester Bragado <CBragado@mullenusa.com>
**Cc:** David Michery <david@mullenusa.com>; Makayla Brown <mbrown@mullenusa.com>; Jonathan New <Jnew@mullenusa.com>; Sandra Boyer <SBoyer@mullenusa.com>; Peter Prisbrey <PPrisbrey@mullenusa.com>; Jillian Green <JGreen@mullenusa.com>; Jillian Green <JGreen@bollingermotors.com>
**Subject:** RE: Subject: Coordination for Immediate 200k Funding and Next Steps - FW: Mullen IT Administrative Access

**CAUTION:** This is an EXTERNAL email. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Chester,

We cannot take direction from communication sent by Mullen on this. We need direction from David, as the Chairman of Bollinger.

As the President of Bollinger Motors, and given the current law suit, I believe the Company should stand by its position on access that is explained in the attached 04/26/2025 PDF email which was discussed with legal and sent on Saturday, until such time that we receive written direction from David to do so otherwise, based on what he believes to be the best interest of the Company.

In communication with Dan this morning, he has reviewed the 51 software applications, after a software admin meeting yesterday, to go thru each software and what can be done to grant access. We are working to prepare to be able to grant access to Mullen to those applications that contain the CAD and other drawings for B1/B2. We are also in the process of separating the IP and creating separate folders, and as soon as this is done, we will start providing Mullen with access to all B1/B2 IP.

As Shane has been sharing with you via emails earlier today, we need funding this week. Please advise if this is acceptable and on status of funding.

Thank You,

**Bryan Chambers**
(248) 379-2747

---

**From:** Shane Monson <smonson@bollingermotors.com>
**Sent:** Monday, April 28, 2025 9:14 AM
**To:** Chester Bragado <CBragado@mullenusa.com>
**Cc:** Bryan Chambers <bryan@bollingermotors.com>; David Michery <david@mullenusa.com>; Makayla Brown <mbrown@mullenusa.com>; Jonathan New <Jnew@mullenusa.com>; Sandra Boyer <SBoyer@mullenusa.com>; Peter Prisbrey <PPrisbrey@mullenusa.com>; Jillian Green <JGreen@mullenusa.com>
**Subject:** Re: Subject: Coordination for Immediate 200k Funding and Next Steps - FW: Mullen IT Administrative Access

Hi Chester,

Our access to Plex was shut down as of this morning. Can you please send the $200K promised last week asap?

I believe Peter now has access to the major items and we are working through everything else and the associated costs this morning.

Get Outlook for iOS

---

**From:** Chester Bragado <CBragado@mullenusa.com>
**Sent:** Thursday, April 24, 2025 3:55:10 PM
**To:** Shane Monson <smonson@bollingermotors.com>
**Cc:** Bryan Chambers <bryan@bollingermotors.com>; David Michery <david@mullenusa.com>; Makayla Brown <mbrown@mullenusa.com>; Jonathan New <Jnew@mullenusa.com>; Sandra Boyer <SBoyer@mullenusa.com>; Peter

Prisbrey <PPrisbrey@mullenusa.com>; Jillian Green <JGreen@mullenusa.com>
**Subject:** Subject: Coordination for Immediate 200k Funding and Next Steps - FW: Mullen IT Administrative Access

Hi Shane,

To move ahead with the $200K wire today and ensure continued financial support, there are a couple of key items we need to have in place from the Corporate side:

- Peter Prisbrey will need global IT administrator access to all systems (please see below for Peter's continued requests)
- The Bollinger HR team will need to check in with Sandra and Makayla for approval before moving forward with any HR actions.

These steps need to be in place before today's funding can be released and will apply to future disbursements as well. Please provide me with evidence of both, so that we can release the funds.

On a positive note, David has secured a $1.5M per week funding commitment and is in discussions with another investor to potentially match that. There's real momentum building.

David is hoping to see the same kind of collaboration we've built between Mullen and Bollinger accounting extended across the organization. We're all in this together.

Best,
Chester

---

**From:** Peter Prisbrey <PPrisbrey@mullenusa.com>
**Sent:** Thursday, April 24, 2025 12:23 PM
**To:** Chester Bragado <CBragado@mullenusa.com>
**Cc:** David Michery <david@mullenusa.com>
**Subject:** FW: Mullen IT Administrative Access

Chester,
David has repeatedly requested access to all of Bollinger's IT systems. David approved the detailed list of systems, which is included below and attached.

Bollinger has only provided Read Only access to their Microsoft 365 environment.

◉ **Admin center access**

Global readers have read-only access to admin cent
other roles are more limited in what they can see ar

☑ Global Reader  ⓘ

☑ Message Center Privacy Reader  ⓘ

☑ Message Center Reader  ⓘ

☑ Reports Reader  ⓘ

☑ Security Reader  ⓘ

-Peter



**Peter Prisbrey**
VP of IT

657-246-3202

1405 Pioneer Street
Brea, CA 92821

<u>mullenusa</u>.com   

---

**From:** Peter Prisbrey
**Sent:** Thursday, April 17, 2025 12:15 PM
**To:** bryan@bollingermotors.com; Dan Miarka <dmiarka@bollingermotors.com>
**Cc:** David Michery <david@mullenusa.com>; Jonathan New <Jnew@mullenusa.com>; Jillian Green <JGreen@mullenusa.com>
**Subject:** Mullen IT Administrative Access

Hello Bryan and Dan,
I've attached the list of Bollinger systems for which Mullen requires administrative access.

As soon as possible, Mullen needs Global Administrator access to Bollinger's Microsoft 365 environment and added to your IT Managed Service Providers list of authorized representatives.

-Peter



**Peter Prisbrey**
VP of IT

657-246-3202
1405 Pioneer Street
Brea, CA 92821

mullenusa.com   

# EXHIBIT B
to
## Declaration of David Michery

(Letter from GEM to Mullen, May 13, 2025)

***Refer to Exhibit 1.D***

# EXHIBIT C

to
# Declaration of David Michery

(Letter from Receiver's Counsel to Jillian Green, May 9, 2025)

***Refer to Exhibit 1.C***

# EXHIBIT D

to

# Declaration of David Michery

(Bollinger Bylaws, September 7, 2022)

AMENDED AND RESTATED

BY-LAWS

OF

BOLLINGER MOTORS, INC.

a Delaware corporation
*(Adopted as of September 7, 2022)*

ARTICLE 1

OFFICES

1.1     Registered Office.  The registered office of Bollinger Motors, Inc. (the "Corporation") in the State of Delaware shall be located at 1007 N. Orange St., 10th Floor, Wilmington, Delaware 19801.  The name of the Corporation's registered agent at such address shall be MWE Corporate Services, LLC.  The registered office and/or registered agent of the Corporation may be changed from time to time by action of the board of directors of the Corporation.

1.2     Other Offices.  The Corporation may also have offices at such other places, both within and without the State of Delaware, as the board of directors may from time to time determine or the business of the Corporation may require.

ARTICLE 2

MEETINGS OF STOCKHOLDERS

2.1     Annual Meeting.  An annual meeting of the stockholders of the Corporation shall be held each year within one hundred twenty (120) days after the close of the immediately preceding fiscal year of the Corporation for the purpose of electing directors and conducting such other proper business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of the annual meeting shall be determined by the president; provided, however, that if the president does not act, the board of directors shall determine the date, time and place, if any, and/or the means of remote communication, of such meeting.  No annual meeting of stockholders need be held if not required by the Corporation's certificate of incorporation or by the General Corporation Law of the State of Delaware (the "DGCL").

2.2     Special Meetings.  Special meetings of the stockholders may be called for any purpose (including, without limitation, the filling of board vacancies and newly created directorships) and may be held at such time and place, within or without the State of Delaware, and/or by means of remote communication, as shall be stated in a written notice of meeting or in a duly executed waiver of notice thereof.  Such meetings may be called at any time by the board of directors or the president and shall be called by the president upon the written request of holders of shares entitled to cast not less than 40 percent of the votes at the meeting, which

written request shall state the purpose or purposes of the meeting and shall be delivered to the president.  The date, time and place, if any, and/or remote communication, of any special meeting of stockholders shall be determined by the president; provided, however, that if the president does not act, the board of directors shall determine the date, time and place, if any, and/or the means of remote communication, of such meeting.  On receipt of a written request for a special meeting in accordance with this Section 2.2, the president shall fix a date and time for such meeting within 20 days after receipt of such written request.

      2.3    Place of Meetings.  The board of directors may designate any place, within or without the State of Delaware, and/or by means of remote communication, as the place of meeting for any annual meeting or for any special meeting called by the board of directors.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Corporation.

      2.4    Notice.  Whenever stockholders are required or permitted to take any action at a meeting, written or printed notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, or by a form of electronic transmission consented to by the stockholder to whom the notice is given, by or at the direction of the board of directors, the president or the secretary, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation.  If given by electronic transmission, such notice shall be deemed to be delivered (a) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (b) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (c) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (1) such posting and (2) the giving of such separate notice; and (3) if by any other form of electronic transmission, when directed to the stockholder.  Any such consent shall be revocable by the stockholder by written notice to the Corporation.  Any such consent shall be deemed revoked if (x) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (y) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

      2.5    Stockholders List.  The officer who has charge of the stock ledger of the Corporation shall make, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days prior to the meeting: (a) on a reasonably accessible electronic network, provided that the information required to gain access

2

to such list is provided with the notice of the meeting, and/or (b) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.   If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.6    Quorum.  The holders of a majority of the votes represented by the issued and outstanding shares of capital stock, entitled to vote thereon, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the Corporation's certificate of incorporation.  If a quorum is not present, the holders of a majority of the shares present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  When a specified item of business requires a vote by a class or series (if the Corporation shall then have outstanding shares of more than one class or series) voting as a class, the holders of a majority of the shares of such class or series shall constitute a quorum (as to such class or series) for the transaction of such item of business.  When a quorum is once present to commence a meeting of stockholders, it is not broken by the subsequent withdrawal of any stockholders or their proxies.

2.7    Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.8    Vote Required.  When a quorum is present, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law or of the Corporation's certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.  Where a separate vote by class is required, the affirmative vote of the majority of shares of such class present in person or represented by proxy at the meeting shall be the act of such class.

2.9    Voting Rights.   Except as otherwise provided by the DGCL or by the Corporation's certificate of incorporation or any amendments thereto and subject to Section 6.3 hereof, every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of common stock held by such stockholder.

3

2.10    Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.  Any proxy is suspended when the person executing the proxy is present at a meeting of stockholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the proxy, notwithstanding the presence of the person executing the proxy.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

2.11    Action by Written Consent.  Unless otherwise provided in the Corporation's certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, or the Corporation's principal place of business, or an officer or agent of the Corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by reputable overnight courier service provided, however, that no consent or consents delivered by certified or registered mail shall be deemed delivered until such consent or consents are actually received at the registered office.  All consents properly delivered in accordance with this Section 2.11 shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days after the earliest dated consent delivered to the Corporation as required by this Section 2.11, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

4

2.12    Action by Facsimile, Email or Other Electronic Transmission Consent.    A facsimile, email or other electronic transmission by a stockholder or proxyholder (or by any person authorized to act on such person's behalf) of a proxy or a written consent to an action to be taken (including the delivery of such a document in the .pdf, .tif, .gif, .peg or similar format attached to an email message) shall be deemed to be written, signed, dated and delivered to the Corporation for the purposes of this ARTICLE 2; provided that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (a) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person authorized to act for the stockholder or proxyholder and (b) the date on which such stockholder or proxyholder or authorized person transmitted such facsimile, email or other electronic transmission.  The date on which such facsimile, email or other electronic transmission is transmitted shall be deemed to be the date on which such consent or proxy was signed.  Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of the board of directors or the secretary of the Corporation, each stockholder, proxyholder or other authorized person who delivered a consent or proxy by facsimile, email or other electronic transmission shall re-execute the original form thereof and deliver such original to the Corporation at its registered office in the State of Delaware, its principal place of business or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.

ARTICLE 3

DIRECTORS

3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the board of directors.

3.2    Number, Election and Term of Office.  The number of directors which shall constitute the first board shall be five (5).  Thereafter, the number of directors shall be established from time to time in accordance with the provisions of that certain Amended and Restated Stockholders Agreement, dated as of September 7, 2022, among the Corporation and certain of its stockholders (the "Stockholders Agreement") or after termination of the Stockholders Agreement, by resolution of the board.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement.  The directors shall be elected in this manner at the annual meeting of the stockholders, except as otherwise provided in Section 3.4.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

3.3    Removal and Resignation.  Subject to the provisions of the Stockholders Agreement, any director or the entire board of directors may be removed at any time, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors

5

by the provisions of the Corporation's certificate of incorporation, the provisions of this <u>Section 3.3</u> shall apply, in respect to the removal without cause of a director or directors so elected, to the vote of the holders of the outstanding shares of that class or series and not to the vote of the outstanding shares as a whole.  Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation.

3.4    <u>Vacancies</u>.  Except as otherwise provided in the Corporation's certificate of incorporation, board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; <u>provided</u> that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships shall be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

3.5    <u>Annual Meetings</u>.  The annual meeting of each newly elected board of directors shall be held without notice (other than notice under these by-laws) immediately after, and at the same place, if any, as the annual meeting of stockholders.

3.6    <u>Other Meetings and Notice</u>.  Regular meetings, other than the annual meeting, of the board of directors may be held without notice at such time and at such place, if any, as shall from time to time be determined by resolution of the board of directors and promptly communicated to all directors then in office.  Special meetings of the board of directors may be called by or at the request of the president or at least two (2) of the directors on at least twenty-four (24) hours' notice to each director, either personally, by telephone, by mail, or by electronic transmission.  In like manner and on like notice, the president must call a special meeting on the written request of at least three (3) of the directors promptly after receipt of such request.

3.7    <u>Quorum, Required Vote and Adjournment</u>.  A majority of the total number of directors then in office authorized shall constitute a quorum for the transaction of business.  The vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the board of directors.  If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Except as otherwise required by the Corporation's certificate of incorporation, each director shall be entitled to one vote on exactly the matter presented to the board for approval.

3.8    <u>Committees</u>.  Subject to the provisions of the Stockholders Agreement, the board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the Corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the board of directors in the management and affairs of the Corporation, except as otherwise limited by law.  The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.  Each committee

6

shall keep regular minutes of its meetings and report the same to the board of directors when required.

3.9     Committee Rules.  Each committee of the board of directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the board of directors designating such committee.  Unless otherwise provided in such a resolution, the presence of a majority of the members of the committee then in office shall be necessary to constitute a quorum. Subject to the provisions of the Stockholders Agreement, in the event that a member and that member's alternate, if alternates are designated by the board of directors as provided in Section 3.8, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in place of any such absent or disqualified member.

3.10    Communications Equipment.   Members of the board of directors or any committee thereof may participate in and act at any meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this Section 3.10 shall constitute presence in person at the meeting.

3.11    Waiver of Notice and Presumption of Assent.  Any member of the board of directors or any committee thereof may waive notice of a meeting at any time before or after such meeting, and any member of the board of directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting, except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.   Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

3.12    Action by Written Consent.  Unless otherwise restricted by the Corporation's certificate of incorporation, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board, or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE 4

OFFICERS

7

4.1     Executive Officers.  The officers of the Corporation shall be elected by the board of directors and shall consist of a chairman of the board, a vice chairman of the board, a president and chief executive officer, one or more vice-presidents, a chief operating officer, a chief financial officer, an executive vice president, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the board of directors. Any number of offices may be held by the same person except that neither the chairman of the board nor the president shall also hold the office of secretary.  In its discretion, the board of directors may choose not to fill any office for any period as it may deem advisable, except that the offices of president and secretary shall be filled as expeditiously as possible.

4.2     Election and Term of Office.  Vacancies may be filled or new offices created and filled at any meeting of the board of directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

4.3     Removal.  Any officer or agent elected by the board of directors may be removed by the board of directors whenever in its judgment the best interests of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.4     Vacancies.  Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the board of directors for the unexpired portion of the term by the board of directors then in office.

4.5     Compensation.  Compensation of all officers shall be fixed by the board of directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

4.6     Chairman of the Board.  The chairman of the board shall be the chief executive officer of the Corporation, and shall have the powers and perform the duties incident to that position.  Subject to the powers of the board of directors, the chairman of the board shall be in the general and active charge of the entire business and affairs of the Corporation, and shall be its chief policy making officer.  The chairman of the board shall preside at all meetings of the board of directors and at all meetings of the stockholders and shall have such other powers and perform such other duties as may be prescribed by the board of directors or provided in these by-laws. Whenever the president is unable to serve, by reason of sickness, absence or otherwise, the chairman of the board shall perform all the duties and responsibilities and exercise all the powers of the president.

4.7     Vice-Chairman.  Whenever the chairman of the board is unable to serve, by reason of sickness, absence, or otherwise, the vice-chairman shall have the powers and perform the duties of the chairman of the board.  The vice-chairman shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the board of directors or these by-laws.

4.8     The President and Chief Executive Officer.  The president and chief executive officer shall be the chief executive officer of the Corporation and, in the absence of the chairman

8

of the board, shall preside at all meetings of the stockholders and board of directors at which he or she is present subject to the powers of the board of directors,  shall have general charge of the business, affairs and property of the Corporation, and control over its officers, agents and employees, and shall see that all orders and resolutions of the board of directors are carried into effect.  The president shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the Corporation.  The president shall have such other powers and perform such other duties as may be prescribed by the chairman of the board or the board of directors or as may be provided in these by-laws.

4.9    Chief Operating Officer.   The chief operating officer of the Corporation, subject to the powers of the board of directors, shall engage in the general and active management of the business of the Corporation; and shall see that all orders and resolutions of the board of directors are carried into effect.  The chief operating officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the president or the board of directors or as may be provided in these by-laws.

4.10    Chief Financial Officer.   The chief financial officer of the Corporation shall, under the direction of the chief executive officer, be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller.  The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the president or the board of directors or as may be provided in these by-laws.

4.11    Vice Presidents.   The vice president, or if there shall be more than one, the vice presidents in the order determined by the board of directors or by the president, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president.  The vice presidents shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the president or the board of directors or as may be provided in these by-laws.

4.12    Secretary and Assistant Secretaries.   The secretary shall attend all meetings of the board of directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose. Under the president's supervision, the secretary shall give, or cause to be given, all notices required to be given by these by-laws or by law, shall have such powers and perform such duties as the board of directors, the chairman of the board, the president or these by-laws may, from time to time, prescribe, and shall have custody of the corporate seal of the Corporation.  The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have

9

such other powers as the board of directors, the chairman of the board, the president, the secretary or these by-laws may, from time to time, prescribe.

4.13   <u>Treasurer and Assistant Treasurer</u>.  The treasurer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the board of directors; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the president and the board of directors, at its regular meeting or when the board of directors so requires, an account of the Corporation; shall have such powers and perform such duties as the board of directors, the chairman of the board, the president or these by-laws may, from time to time, prescribe.  If required by the board of directors, the treasurer shall give the Corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the office of treasurer and for the restoration to the Corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the Corporation.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors, shall in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer.  The assistant treasurers shall perform such other duties and have such other powers as the board of directors, the chairman of the board, the president, the treasurer or these by-laws may, from time to time, prescribe.

4.14   <u>Other Officers, Assistant Officers and Agents</u>.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the board of directors.

4.15   <u>Absence or Disability of Officers</u>.  In the case of the absence or disability of any officer of the Corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the board of directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

ARTICLE 5

<u>INDEMNIFICATION OF OFFICERS, DIRECTORS AND OTHERS</u>

5.1   <u>Nature of Indemnity</u>.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether brought by or in the right of the Corporation or any of its subsidiaries and whether civil, criminal, administrative or investigative (hereinafter a "<u>Proceeding</u>"), or any appeal of such Proceeding, by reason of or arising out of the fact that such person is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, general partner, of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, (each such person, an "<u>Indemnitee</u>"), shall be indemnified and held harmless by the

10

Corporation to the fullest extent which it is empowered to do so unless prohibited from doing so by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees actually and reasonably incurred by such Indemnitee in connection with such Proceeding) ,and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; but only if such Indemnitee acted in good faith and in a manner which such Indemnitee reasonably believed to be (in the case of such Indemnitee's official capacity) in the best interests of the Corporation or (in all other cases) not opposed to the best interests of the Corporation, and in addition, in the case of a criminal Proceeding, such Indemnitee had no reasonable cause to believe that his or her conduct was unlawful; provided that, except as provided in Section 5.2, the Corporation shall indemnify any such Indemnitee seeking indemnification in connection with a Proceeding initiated by such Indemnitee only if such Proceeding was authorized by the board of directors of the Corporation.  The right to indemnification conferred in this ARTICLE 5 shall be a contract right and, subject to Sections 5.2 and 5.5 hereof, shall include the right to be paid by the Corporation the expenses incurred in defending any such Proceeding in advance of its final disposition.  Notwithstanding the provisions of this Section 5.1, no indemnification shall be made in connection with any Proceeding charging improper personal benefit to an Indemnitee, whether or not involving actions in such Indemnitee's official capacity, in which such Indemnitee is adjudicated liable on the basis that personal benefit was improperly received by such Indemnitee.

5.2     Procedure for Indemnification of Directors and Officers.  Any indemnification of an Indemnitee provided for under Section 5.1 or advance of expenses provided for under Section 5.5 shall be made promptly, and in any event within thirty (30) days, upon the written request of the Indemnitee.  If a determination by the Corporation that the Indemnitee is entitled to indemnification pursuant to this ARTICLE 5 is required, and the Corporation fails to respond within sixty (60) days to a written request for indemnity, the Corporation shall be deemed to have approved the request.  If the Corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not properly made within thirty (30) days, the right to indemnification or advances as granted by this ARTICLE 5 shall be enforceable by the Indemnitee in any court of competent jurisdiction.  Such Indemnitee's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the Corporation.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any Proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Corporation) that the Indemnitee has not met the standards of conduct which make it permissible under the DGCL for the Corporation to indemnify the Indemnitee for the amount claimed; provided, however, it shall be presumed that the Indemnitee met such standards and the Corporation shall have the burden of proof to overcome that presumption.  Neither the failure of the Corporation (including its board of directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the

11

Corporation (including its board of directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

5.3     Rights Not Exclusive.  The rights to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this ARTICLE 5 shall not be exclusive of any other right which any Indemnitee may have or hereafter acquire under any statute, provision of the Corporation's certificate of incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise, and such rights to indemnification and payment of expenses shall inure to the benefit of the heirs and legal representatives of such Indemnitee.

5.4     Insurance.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or agent of the Corporation or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the Corporation would have the power to indemnify such person against such liability under this ARTICLE 5.

5.5     Expenses.  Expenses incurred by any Indemnitee in defending a Proceeding shall be paid by the Corporation in advance of such Proceeding's final disposition unless otherwise determined by the board of directors in the specific case upon receipt of an undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified by the Corporation.

5.6     Indemnification Priority.  The Corporation hereby acknowledges that certain directors and officers affiliated with institutional investors may have certain rights to indemnification, advancement of expenses and/or insurance provided by such institutional investors or certain of their affiliates (collectively, the "Institutional Indemnitors"). The Corporation hereby agrees that (i) the Corporation is the full indemnitor of first resort (i.e., its obligations to the Indemnitee are primary and any obligation of the Institutional Indemnitors to advance expenses, to provide indemnification and/or to provide insurance for the same expenses or liabilities incurred by the Indemnitee are secondary), (ii) the Corporation shall be required to advance the full amount of expenses incurred by the Indemnitee in accordance with this ARTICLE 5 without regard to any rights the Indemnitee may have against the Institutional Indemnitors, and (iii) the Corporation irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of the Indemnitee with respect to any claim for which the Indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Indemnitee against the Corporation.  No right of indemnification, advancement of expenses or other right of recovery that an Indemnitee may have from any Institutional Indemnitor or any insurer providing insurance coverage under any policy purchased or maintained by an Institutional Indemnitor shall reduce or otherwise alter the rights of the

Indemnitee or the obligations of the Corporation hereunder.  Each Indemnitee shall execute all papers reasonably required and shall do all things that may be reasonably necessary to secure the rights of such Indemnitee's Institutional Indemnitors under this Section 5.6, including the execution of such documents as may be necessary to enable the Institutional Indemnitors effectively to bring suit to enforce such rights, including in the right of the Corporation.  Each of the Institutional Indemnitors shall be third-party beneficiaries with respect to this Section 5.6, entitled to enforce this Section 5.6.

 5.7 Amounts Received from an Another Entity.  The Corporation's obligation, if any, to indemnify any Indemnitee who was or is serving at the Corporation's request as a director, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise shall be reduced by any amount such Indemnitee may collect as indemnification or advancement of expenses from such other corporation, partnership, limited liability company, joint venture, trust or other enterprise.

 5.8 Other Indemnification and Advancement of Expenses.  This ARTICLE 5 shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Indemnitees, including, without limitation, employees and agents of the Corporation, when and as authorized by the board of directors.

 5.9 Contract Rights.  The provisions of this ARTICLE 5 shall be deemed to be a vested contract right between the Corporation and each director and officer who serves in any such capacity at any time while this ARTICLE 5 and the relevant provisions of the DGCL or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this ARTICLE 5 or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or Proceeding regardless of when occurring.  Indemnitees who after the date of the adoption of this ARTICLE 5 become or remain an Indemnitee described in Section 5.1 will be conclusively presumed to have relied on the rights contained in this ARTICLE 5 in entering into or continuing the service.

 5.10 Merger or Consolidation.  For purposes of this ARTICLE 5, references to "the Corporation" shall include any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger with the Corporation which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this ARTICLE 5 with respect to the Corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

ARTICLE 6

CERTIFICATES OF STOCK

13

6.1 <u>Form</u>. Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by the chairman, vice-chairman, president or a vice-president and the secretary or an assistant secretary of the Corporation, certifying the number of shares owned by such holder in the Corporation. If such a certificate is countersigned (a) by a transfer agent or an assistant transfer agent other than the Corporation or its employee or (b) by a registrar, other than the Corporation or its employee, the signature of any such chairman, vice-chairman, president, vice-president, secretary, or assistant secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the Corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the Corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the Corporation. All certificates for shares shall be consecutively numbered or otherwise identified. The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the Corporation. Shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps. In that event, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books. The board of directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the Corporation.

6.2 <u>Lost Certificates</u>. The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

6.3 <u>Fixing a Record Date for Stockholder Meetings</u>. In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if

14

notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u> that the board of directors may fix a new record date for the adjourned meeting.

6.4     <u>Fixing a Record Date for Action by Written Consent</u>.   In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the board of directors.  If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the board of directors and prior action by the board of directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

6.5     <u>Fixing a Record Date for Other Purposes</u>.   In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

6.6     <u>Registered Stockholders</u>.   Prior to the surrender to the Corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the Corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.  The Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

6.7     <u>Subscriptions for Stock</u>.   Unless otherwise provided for in the subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and at such times, as shall be determined by the board of directors.  Any call made by the board of directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series.  In case of default in the payment of any installment or call when

15

such payment is due, the Corporation may proceed to collect the amount due in the same manner as any debt due the Corporation.

## ARTICLE 7

## GENERAL PROVISIONS

7.1     <u>Dividends</u>.  Dividends upon the capital stock of the Corporation, subject to the provisions of the Corporation's certificate of incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Corporation's certificate of incorporation.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

7.2     <u>Checks, Drafts or Orders</u>.  All checks, drafts, or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the board of directors or a duly authorized committee thereof.

7.3     <u>Contracts</u>.  The board of directors may authorize any officer or officers, or any agent or agents, of the Corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

7.4     <u>Loans</u>.  The Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this <u>Section 7.4</u> shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

7.5     <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be January 1 through December 31 or as otherwise fixed by resolution of the board of directors.

7.6     <u>Corporate Seal</u>.  The board of directors shall provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

7.7     <u>Voting Securities Owned By Corporation</u>.   Voting securities in any other corporation or other entity (such as a limited liability company, limited partnership or trust) held by the Corporation shall be voted as directed by the board of directors, unless the board of directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.   Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

7.8     <u>Inspection of Books and Records</u>.   Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom.   A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder.   In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder.   The demand under oath shall be directed to the Corporation at its registered office in the State of Delaware or at its principal place of business.

7.9     <u>Exclusive Jurisdiction</u>.   Unless otherwise waived by resolution of the board of directors, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (a) any derivative action or Proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL or the Corporation's certificate of incorporation or by-laws, or (d) any action asserting a claim against the Corporation governed by the internal affairs doctrine.

7.10    <u>Section Headings</u>.   Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

7.11    <u>Inconsistent Provisions</u>.   In the event that any provision of these by-laws is or becomes inconsistent with any provision of the Corporation's certificate of incorporation, the DGCL or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE 8

<u>AMENDMENTS</u>

These by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the board of directors by a majority vote.   The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the board of directors shall not divest the stockholders of the same powers.   Unless otherwise provided by applicable law or the the Corporation's certificate of incorporation, the stockholders, by the affirmative vote of the holders of a majority of the stock issued and outstanding and having voting power may, at any annual or

17

special meeting if notice of such alteration or amendment of the by-laws is contained in the notice of such meeting, adopt, amend, or repeal these by-laws, and alterations or amendments of by-laws made by the stockholders in accordance with this <u>ARTICLE 8</u> shall not be altered or amended by the board of directors.

## ARTICLE 9

## <u>CERTAIN BUSINESS COMBINATIONS</u>

The Corporation, by the affirmative vote (in addition to any other vote required by law or the Corporation's certificate of incorporation) of its stockholders holding a majority of the shares entitled to vote, expressly elects not to be governed by §203 of the DGCL; <u>provided</u> that the amendment of these by-laws adopting this election (a) shall not become effective until September 7, 2023, and (b) shall not apply to any business combination (as defined in said §203) between the Corporation and any person who became an interested stockholder (as defined in said §203) of the Corporation on or prior to September 7, 2022.  The by-law amendment adopting this provision shall not be further amended by the board of directors.

## ARTICLE 10

## <u>STOCKHOLDERS AGREEMENT</u>

In the event of a conflict between the terms of these bylaws and the terms of the Stockholders Agreement, the terms of the Stockholders Agreement shall control.

\*      \*      \*      \*      \*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of May, 2025, I electronically filed the foregoing **Proposed Intervenor Mullen Automotive, Inc's Emergency Motion to Intervene** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.:

*/s/ Jennifer L. Beidel*
Jennifer L. Beidel